**CONSOLIDATED RAIL CORPORATION,**
Plaintiff,

v.

**STANDARD MILLING COMPANY,**
Defendant.

No. CIV-80-577E.

United States District Court,
W. D. New York.

Feb. 18, 1981.

Moot, Sprague, Marcy, Landy, Fernbach & Smythe, Buffalo, N. Y., for plaintiff (Ruth R. O'Keefe, Buffalo, N. Y., of counsel).

Jaeckle, Fleischmann & Mugel, Buffalo, N. Y., for defendant (Henry W. Killeen, III, Buffalo, N. Y., of counsel).

## MEMORANDUM AND ORDER

ELFVIN, J.

Plaintiff ("ConRail") seeks to recover $69,691.00 in demurrage charges said to be owed by defendant ("Standard"). Standard has interposed the defense of accord and satisfaction and moved to dismiss the Complaint under Fed.R.Civ.P. rule 12(b). I am treating said motion as a motion for summary judgment.

Standard operates grain elevators and other milling facilities and receives shipments of grain via rail service provided by ConRail. Standard's rail yard is capable of holding approximately twenty-three cars. When grain shipments of more than twenty-three cars are received, ConRail delivers the maximum number of cars to Standard which unloads the cars and then requests ConRail to remove the empties and deliver more cars. This process is repeated until the entire shipment is unloaded by Standard.

Under applicable tariffs, Standard is given a certain period of time in which to unload the cars after they have been made available to it. If Standard fails to unload the cars timely it becomes liable for demurrage charges for each day the cars are retained beyond the specified free time. Standard would not be liable for demurrage charges if the delay in unloading was caused by ConRail.

In 1979, ConRail billed Standard for demurrage charges totalling $72,481.00. Standard refused to pay the charges because it considered that ConRail was responsible for the unloading delays. James Bahleda, a Vice President of Standard, sent a letter December 28, 1979 to W. E. Brown, ConRail's Manager of Demurrage, in which he stated that the demurrage charges were "improper" because ConRail's service had been "erratic at best" and that Standard could not be "responsible for ConRail's failure to provide promised service * * *." Bahleda's letter noted that Standard might be liable for some of the charges and concluded:

"* * * [W]e do not concede that any demurrage is owing on these trains. In order to resolve this entire dispute without further controversy, however, we are willing to make a payment of $2,790.00 for demurrage on the larger train of 62 cars in full settlement of all demurrage charges referred to in this letter.

"Therefore, I am enclosing our check in the amount of $2,790.00 which, if accepted, shall be in full payment for all demurrage charges incurred by us for the periods February 20–23, 1979 and August 7–October 1, 1979." [Emphasis added.]

ConRail negotiated the check that had been enclosed with the letter.

In March 1980, counsel for ConRail attempted to return Standard's payment on the grounds that ConRail had no authority to compromise the demurrage charges against Standard. Standard refused to accept return payment, its counsel explaining that ConRail's acceptance of Standard's check constituted "a valid accord and satisfaction which cannot be repudiated * * *." ConRail commenced this action to recover the demurrage charges less Standard's payment thereon.

■ Standard's motion raises the initial question whether ConRail may legally settle a claim for demurrage charges. The Interstate Commerce Act, 49 U.S.C. § 10741(a), provides that a common carrier such as ConRail:

"* * * may not charge or receive from a person a different compensation * * * for a service rendered * * * in transportation the carrier may perform under this subtitle than it charges or receives from another person for performing a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances."

Under 49 U.S.C. § 10761(a), a carrier may not charge or receive a rate different than the rate prescribed in the applicable tariff. ConRail argues that these statutory provisions prevent it from compromising a claim for demurrage charges. I agree.

■ Under the Interstate Commerce Act, filed tariffs have the force of law and therefore may not be modified by private agreement. *Ill. Cent. Gulf R. Co. v. Golden Triangle, Etc.*, 586 F.2d 588, 592 (5th Cir. 1978); *In re Penn Central Transportation Co.*, 477 F.2d 841, 844 (3d Cir. 1973). It is stated in *L. & N.R.R. v. Central Iron Co.*, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924):

"The amount of the freight charges legally payable was determined by applying this tariff rate to the actual weight. Thus, they were fixed by law. No contract of the carrier could reduce the amount legally payable; or release from liability a shipper who had assumed an obligation to pay the charges. Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount by a person liable therefor."

Thus, it is generally held that a carrier may not settle a claim for charges due under a tariff. *Chicago, B. & Q. R. Co. v. Ready Mixed Concrete Co.*, 487 F.2d 1263 (8th Cir. 1973); *In re Penn Central Transportation Co.*, supra; *Baker v. Southeastern Mich. Shippers Co-Op Ass'n*, 376 F.Supp. 149 (E.D. Mich.1973); *Norton v. Shotmeyer*, 72 F.Supp. 188, 191 (D.N.J.1947). *See, also, Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334, 343 (1st Cir. 1970) ("a carrier can recover undercharges from a shipper regardless of contrary

agreement, misquotation by the carrier, reliance, or other equitable defense"); *Alleghany Corporation v. Romco, Inc.*, 392 F.Supp. 38, 40 (W.D.Pa.1975) ("no defenses such as estoppel by conduct of the carrier, reliance by the shipper, innocence of the shipper, hardship on the shipper, [or] agreement by the parties may avail a shipper"); *Union Pacific Railroad Company v. Higgins*, 223 F.Supp. 396, 401 (D.N.D.1963) ("a carrier cannot waive or be estopped from collecting full charges prescribed by published tariffs").

■ Standard concedes that a carrier is prohibited from accepting less than the full tariff charge, but argues that "the carrier has substantial freedom in establishing what the proper charge under the tariff actually *is*." In this respect Standard seeks to bind ConRail to an alleged agreement that proper demurrage charges totalled $2,790.00. It is clear, however, that a carrier's agreement to accept a specified sum does not bar an action to recover the full tariff rate, if for any reason it later appears that the sum received was less than the amount actually due under the tariff. *Ill. Cont. Gulf R. Co. v. Golden Triangle Etc.*, supra; *Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, supra.

Moreover, Standard's attempt to distinguish cases such as *In re Penn Central Transportation Co.*, supra, overlooks their underlying rationale. In limiting the defenses available to a shipper in an action to recover tariff charges, courts have expressed concern that the parties may seek through sham devices to avoid application of the tariffs. *See, e. g., Chicago, B. & O. R. Co. v. Ready Mixed Concrete Co.*, supra, at 1267; *In re Penn Central Transportation Co.*, supra, at 844. The court in *Ill. Cent. Gulf R. Co. v. Golden Triangle, Etc.*, supra, at 592, explained that to permit a shipper to invoke estoppel against a railroad would permit "rate discrimination to occur through the subterfuge of a carrier's deliberately misinforming a shipper as to the proper charges for services to be rendered." The same rationale is applicable in the present case; the defense of accord and

satisfaction would allow carriers to treat favored shippers in a preferential manner by compromising "disputes" over the amount of demurrage charges due.

Standard points out that under Interstate Commerce Commission regulations a carrier is authorized to settle claims for overcharge. 49 C.F.R. § 1008.8. A claim for an overcharge implies that the shipper has already paid the carrier's claim. 49 U.S.C. §§ 11705(b)(1) and 11706(b). This distinction may seem trivial but the Commission's regulations are designed to ensure compliance with the tariffs. The regulations prescribe certain procedures to be followed in disposing of overcharge claims and there has been no showing that the procedures have been followed here.

Therefore, Standard's motion to dismiss is hereby ORDERED denied. Standard may, of course, plead and attempt to prove its defense that the demurrage charges sought by ConRail were caused by ConRail's own fault.