MOTOR CARRIER AUDIT &
COLLECTION CO., Plaintiff,

v.

FAMILY DOLLAR STORES,
INC., Defendant.

No. C–C–86–415–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 14, 1987.

Lawrence A. Winkle, Winkle & Wells, Dallas, Tex., Robert Walker, Sims, Walker & Steinfeld, Washington, D.C., for plaintiff.

Patricia Hummel Seifert, Gardere & Wynne, Dallas, Tex., William P. Farthing, Jr., Parker, Poe, Thompson, Bernstein, Gage & Preston, Charlotte, N.C., for defendant.

## MEMORANDUM AND ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Defendant's, Family Dollar Stores, Inc. ("Family Dollar"), Motion to stay the present suit and to refer it to the Interstate Commerce Commission ("ICC"). For the reasons stated below, Defendant's Motion will be granted.

### BACKGROUND FACTS

Sometime before April 1983, a sales representative and regional manager for RTC Transportation, Inc. ("RTC") approached Family Dollar about providing RTC's transportation services to Defendant. RTC's agents prepared a written rate schedule, and submitted it to the Defendant. Defendant alleges that RTC's agents represented to Defendant that (1) the rates contained in the schedule were "protected," (2) that they were effective for all shipments tendered to RTC, and (3) that shipments under these rates could begin immediately. Defendant did use RTC's transportation services, and it allegedly did so solely upon RTC's agents' assurances that the rates presented were then effective. There is no evidence or allegation that such services were provided under a written contract. In addition, there is nothing before the Court indicating that RTC was a "contract carrier" granted relief by the ICC from complying with the requirement that tariff rates be filed.

RTC provided transportation services for Defendant and billed Defendant for the shipments based upon the rates contained in the schedule presented to Defendant. Defendant paid these bills. RTC never demanded further payment, nor sent corrected freight bills for any services provided to Defendant.

After these shipments were made and paid for, RTC assigned its freight bills and

accounts receivable to Plaintiff, Motor Carrier Audit and Collection Company, a division of Delta Traffic Services, Inc. ("Motor Carrier"). Thereafter, approximately three years after the shipments, Plaintiff informed Defendant that it had been undercharged for the shipments RTC made in April 1983. RTC had failed to file with the ICC the rate schedule it had shown to Defendant and used when billing Defendant. RTC's *proposed* rate schedule, which was used in calculating Defendant's orders, did not become an *effective published* tariff until June 1983.

On April 2, 1986, Plaintiff filed a Complaint in the United States District Court for the Northern District of Texas. In its Complaint, Plaintiff alleged that the shipments made prior to June 1983 were subject to the tariff on file with the ICC at that time, and therefore, Defendant is liable for undercharges: The rates in the tariff existing before June 1983 were higher than those in RTC's proposed rate schedule. In addition, the stop-off charge was higher, and double-billing was allowed on some loads because of stop-offs. Plaintiff is seeking to recover $13,213.90—the difference between the freight bills Defendant paid and the freight bills as they would be calculated using the higher filed rates and billing procedures as they appeared in the published tariff in effect in April 1983 —, plus interest from and after the date of demand for payment. Plaintiff is also seeking costs incurred and expended in the present suit, and for other and further relief as the Court may order.

On August 25, 1986, pursuant to Section 1391, Title 28 U.S.C., this case was transferred from the Northern District of Texas to this Court. At the time the case was transferred, the district court had pending before it Defendant's Motion to Dismiss or to Stay Proceedings and to Refer to the ICC. On August 31, 1987 the parties presented oral arguments on that Motion to this Court, and it is that Motion which this Court now considers.

## THE MOTION AND THE APPLICABLE LAW

This Court's jurisdiction is based on Section 1337(a), Title 28 U.S.C., since Plaintiff's claim arises under Section 10761(a), Title 49 U.S.C. *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 534–35, 103 S.Ct. 1343, 1344, 75 L.Ed.2d 260 (1983) (per curiam); *Louisville & Nashville R.R. Co. v. Rice,* 247 U.S. 201, 38 S.Ct. 429, 62 L.Ed. 1071 (1918); *Kansas City Terminal Ry. Co. v. Jordan Mfg. Co.,* 750 F.2d 551, 552 (7th Cir.1984). Section 10761(a) states in pertinent part that

> *[a] carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff* whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.

49 U.S.C.A. § 10761(a) (West Supp.1987) (emphasis added). Plaintiff bases his claim on both the above-quoted section and the "filed rate" doctrine which has emerged from prior administrative and judicial precedents. *Seaboard System R.R., Inc. v. United States,* 794 F.2d 635, 638 (11th Cir. 1986) ("The statute does not say what remedy is available if less than the tariff rate has in fact been charged and paid for past shipments. That has been worked out by [ICC] and judicial decision."). Plaintiff is suing under this section because its predecessor in interest, RTC, was a common carrier governed by Section 10761(a).

The "filed rate" doctrine is simply a rule of law that requires carriers subject to the Interstate Commerce Act ("the Act"), such as RTC, to collect, and for their shippers to pay, all lawful charges set forth in the applicable tariffs. *Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915) ("the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext"). The purpose of the "filed rate" doctrine is to prevent carriers from giving by secret agreements discriminatory preferences to large volume shippers. *See Armour Packing Co. v. United States,* 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908). The

United States Supreme Court has adhered to the "filed rate" doctrine many times. *See, e.g., Thurston Motor Lines v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534–35, 103 S.Ct. 1343, 1344, 75 L.Ed.2d 260 (1983) ("A carrier's claim is, of necessity, predicated on the tariff—not an understanding with the shipper."); *Southern Pac. Transp. Co. v. Commercial Metal Co.*, 456 U.S. 336, 352, 102 S.Ct. 1815, 1825, 72 L.Ed.2d 114 (1982) (carrier's violation of ICC credit regulations cannot be raised as an affirmative equitable defense to carrier's claim for undercharges); *Louisville & Nashville R.R. v. Central Iron & Coal*, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924); *Louisville & Nashville R.R. v. Rice*, 247 U.S. 201, 202, 38 S.Ct. 429, 62 L.Ed. 1071 (1918) (reaffirmed in *Thurston Motor Lines*, 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983)); *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915).

Defendant in the present Motion argues, however, that this Court should not blindly follow the "filed rate" doctrine. Instead, Defendant urges this Court to stay the proceedings and to refer the Plaintiff's claim to the ICC.

When a party requests that a matter in a lawsuit pending before the Court be referred to an administrative agency, that party is asserting that the agency has "primary jurisdiction." As the United States Supreme Court stated:

"Primary jurisdiction" ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956) (citing *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433, 60 S.Ct. 325, 331, 84 L.Ed. 361 (1940)). Section 1336(b) of Title 28 U.S.C.A. anticipates that the district courts may refer questions and issues to the ICC and provides that:

When a district court ... refers a question or issue to the [ICC] for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the [ICC] arising out of such referral.

28 U.S.C.A. § 1336(b) (West Supp.1987).

Defendant argues that the present case is an appropriate one to refer to the ICC because only that administrative agency can make a valid determination as to whether Plaintiff's attempt to collect the alleged undercharges should be barred as an "unreasonable practice." *See* 49 U.S.C.A. § 10701(a) (West Supp.1987) (A "practice related to transportation or service provided by a carrier subject to the jurisdiction of the [ICC] ... must be reasonable."); *id.* §§ 10101(b), 10321, 10704 (sections of the Act that together provide for the ICC's unreasonable practice jurisdiction); *National Indus. Transp. League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates: Ex Parte No. MC-177.* 1986 Fed.Carr.Cas. (CCH) ¶ 37,284, at 47,348, 47,351 (1986) [hereinafter *NITL—Petition to Institute Rulemaking*] ("in the highly competitive motor carrier industry and economy in general, equitable defenses to rigid application of filed tariff rates should be available on a case-by-case basis and [the ICC's] unreasonable practice jurisdiction authorizes such an approach.").

Defendant's Motion to Stay Proceedings and to Refer to the ICC is an attempt to set up an equitable defense of estoppel to Plaintiff's "filed rate" based claim. Defendant relies upon a recent court opinion, *Seaboard Sys. R.R. v. United States*, 794 F.2d 635 (11th Cir.1986), and an ICC policy statement, *NITL—Petition to Institute Rulemaking*, 1986 Fed.Carr.Cas. (CCH) ¶ 37,284 at 47,348 (1986), to support its motion to refer the matter to the ICC. Defendant wants to have the ICC review the circumstances surrounding the April

1983 RTC shipments because an ICC determination that Plaintiff's attempt to collect the undercharges is an unreasonable practice may provide the basis for a defense of equitable estoppel to Plaintiff's claim in this Court.

In *Seaboard System Railroad, Inc.,* 794 F.2d 635, the United States Court of Appeals for the Eleventh Circuit reviewed and affirmed an ICC determination that a carrier was barred from collecting undercharges. *Id.* at 638. In *Seaboard,*

> there was no evidence that the carrier intentionally or knowingly undercharged, ... waiving the undercharges was unlikely to encourage carriers to indulge in intentional discriminatory rate "misquotations," and ... the shipper relied upon the carrier's continuing conduct in misleading the shipper as to the applicable rate under a confusing tariff.

*Id.* The *Seaboard* court noted that the ICC was departing from its prior settled precedent regarding the "filed rate" doctrine. *Id.* at 639. Nevertheless, the *Seaboard* court approved of the ICC's action because the ICC's change of policy was consistent with its statutory mission as set out in the Act. *Id.* (Section 10701(a) of Title 49 U.S.C. delivers to the ICC authority over the reasonableness of a carrier's course of conduct.).

Prior to *Seaboard,* the ICC considered a petition filed by the National Industrial Transportation League ("NITL") to institute rulemaking on negotiated motor common carrier rates. *See NITL—Petition to Institute Rulemaking,* 1986 Fed.Carr.Cas. (CCH) ¶ 37,284, at 47,348 (1986). Advance notice of the proposed rulemaking was issued on September 13, 1985, and public comment was invited. *Id.* at 47,348. The rule proposed by the NITL

> would declare a negotiated (but unpublished) motor common carrier rate to be the maximum reasonable rate "if the shipper acted with a good faith belief that the negotiated rate was the legally applicable rate."

*Id.* On May 8, 1986, the ICC held an open voting conference on the NITL proposal,

and it voted to adopt a policy statement that,

> in light of the Motor Carrier Act of 1980 the filed rate doctrine does not necessarily bar equitable defenses ..., [and] if a case is referred to the [ICC, it] will decide if the collection of undercharges would be an unreasonable practice.

*Id.* ("ICC policy statement").

Thereafter, on June 12, 1986, as supplemented July 7, 1986, Carrier Credit and Collection ("CCC") filed a petition to reopen the ICC's record on this subject so that the ICC could reconsider its policy statement. *Id.* at 47,349. CCC argued that the ICC's May 8, 1986 policy statement conflicted with two court decisions: *Square D. Co. v. Niagara Frontier Traffic Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *Regular Common Carrier Conference v. United States,* 793 F.2d 376 (D.C. Cir.1986). The ICC treated CCC's petition as late-filed comments to the proposed rulemaking. The ICC concluded, however, that neither of the two cases cited by CCC precluded the ICC from adopting its new policy statement, and it denied CCC's petition to reopen the matter. *NITL—Petition to Institute Rulemaking,* 1986 Fed.Carr.Cas. (CCH) ¶ 37,284, at 47,349.

The ICC, in reaching the conclusion noted above, discussed and defended its policy statement. The ICC, as a preliminary matter, conceded that it did not have the statutory authority to abrogate Section 10761, Title 49 U.S.C., and therefore could not adopt outright the rule proposed by the NITL. In addition, the ICC conceded that it does not have the authority to order the waiver of undercharges since the United States District Courts are the only bodies that can hear undercharge suits. 1986 Fed.Carr.Cas. at 47,350. Nevertheless, the ICC defended on a number of grounds its authority to consider all the circumstances surrounding an undercharge suit brought in the district court. *Id.*

First, the ICC cited *Seaboard,* 794 F.2d 635, as authority for the proposition that Section 10701(a), Title 49 U.S.C., gives the ICC authority to consider whether a partic-

ular undercharge suit is an unreasonable practice. 1986 Fed.Carr.Cas. at 47,350.

Second, the ICC asserted that

[i]n particular circumstances it could be fundamentally unfair not to consider a shipper's equitable defenses to a claim for undercharges.... [T]he filed rate doctrine was not intended to condone or reward carriers ... where carrier actions may constitute fraudulent business practices.

*Id.*

Third, the ICC recognized that a new regulatory environment may have been produced by the Motor Carrier Act of 1980 ("MCA") and that, therefore, a fresh look was required in order to formulate the "proper regulatory response to the matter of unfiled negotiated motor carrier rates." *Id.*

[T]he MCA dramatically altered the competitive atmosphere of the motor carrier industry. The relaxation of regulatory requirements and Commission oversight has resulted in intense, new competition. Thousands of carriers have entered the market with broad operating authority and increased pricing freedom. The new business atmosphere requires these carriers to price competitively and on extremely short notice....

It is not clear why [the issue of whether carriers should be permitted to collect undercharges after they have made representations to their shippers as to the effective filed rate] has developed. Some carriers argue that it is purely inadvertent that tariffs reflecting negotiated rates are not filed. Certain shippers believe the practice is intentional. Whatever the reason, the potential for this [type of] problem is significant. ... [H]undreds, or even thousands, of individual motor common carrier rates are negotiated daily. In these circumstances, it can be extremely difficult for shippers to determine, prior to movement, whether the agreed rate is actually on file.

*Id.* at 47,351.

The ICC invited district courts considering carrier undercharge claims to refer the cases to the ICC for an administrative determination as to whether the collection of undercharges based on rates contained in the filed tariff would constitute an unreasonable practice. *Id.* at 47,352. After receiving the ICC's advisory opinion, the referring district court "would retain final authority to set the remedy, if any, and review [the ICC's advisory] determination." *Id.;* 28 U.S.C.A. § 1336(b) (West Supp. 1987).

Several district courts and United States bankruptcy courts have been faced with the issue of whether, in light of the ICC policy statement, to refer undercharge claim cases to the ICC for its administrative review. The courts have been divided on the issue.

Some courts have refused to refer their undercharge claim cases to the ICC because of the perceived constraints of the filed rate doctrine. These courts have correctly recognized that *they* will retain final authority over such cases after the ICC renders its advisory analyses, and they have held referral to be a useless exercise since the courts will ultimately be constrained by prior precedent to apply the filed rate. *See, e.g., Taynton Freight Sys., Inc. v. Tripar Transp., Inc.,* 76 B.R. 971 (Bankr.M.D.Pa.1987) (motor carrier's collection claim "does not involve issues reserved for the special competence of an administrative body and ... Bankruptcy Court must ultimately be the arbiter of th[e] cases"; "[r]eferral of th[e] cases to the ICC would involve an unnecessary delay"); *West Coast Truck Lines, Inc. v. Kaiser Aluminum & Chem. Co.,* No. C–87–0048 MHP, slip. op. at 9 (N.D.Cal. July 28, 1987) (the tariff rate must apply and therefore "referral to the ICC is not practicable"); *Motor Carrier Audit & Collection Co. v. United Food Serv. Inc.,* Civ. No. 87–C–298, slip op. at 6–7 (D.C.Col. May 4, 1987) [Available on WESTLAW, DCT database] ("While the ICC may have authority to issue an advisory opinion concerning the reasonableness of allowing [a carrier] to collect the alleged undercharge, absent some indication that the Congress sought to change [the filed rate doctrine], this

court cannot adopt such an [ICC] opinion as its holding would contradict clear precedent.... [R]eferring this matter to the ICC would serve no useful purpose."); *Cooper v. California Consol., Enters., Inc. (In re Carolina Motor Express, Inc.),* 78 B.R. 773, 774 (Bankr.W.D.N.C.1987) ("Because this Court must ultimately be the arbiter of this cause, it finds that referral would involve an unnecessary delay in the resolution of this adversary proceeding.").

Other courts have taken up the ICC's invitation to refer appropriate undercharge claim cases to the ICC. *See, e.g., Christison v. Caterpillar, Inc. (In re Tobler Transfer, Inc.),* 74 B.R. 373, 377 (Bankr.C. D.Ill.1987) (Trustee's undercharge claims on behalf of bankrupt carrier "are at the heart of the ICC's authority and, in the interest of uniformity should be initially heard by the ICC."); *Breman's Express Co. v. H & H Distrib. Co. (In re Breman's Express Co.),* 69 B.R. 356, 359 (Bankr.W.D. Pa.1987) ("the issue presented before us must first be referred to the ICC, so that we might be aided in our final determination by that agency's special competence and expertise"); *INF, Ltd. v. Spectro Alloys Corp.,* 651 F.Supp. 1405, 1407 (D.Minn.1987) ("Proper concern for 'promoting proper relationships between the courts and administrative agencies' leads to the conclusion that this litigation should be stayed so that the ICC may determine whether [plaintiff's] action is unreasonable.' ") (citation omitted); *Indiana Harbor Belt R.R. Co. v. Industrial Scrap Corp.,* No. 85–C–9740, slip op. at 3 (N.D.Ill. June 19, 1986) (WESTLAW, DCTU database); *see Wakefern Food Corp. v. Southwest Freight Lines, Inc.,* No. MC–C–10991, slip op. at 1 (ICC May 21, 1987) (case on court referral with ICC rendering an advisory opinion).

Although the matter is not free from doubt, this Court agrees with the courts that have found referral to the ICC to be the proper procedure. In the present case, RTC's agents apparently intentionally or negligently failed to file the proposed rate schedule that was shown to Family Dollar.

Family Dollar was billed under the proposed rate, and it paid according to the proposed rate. These circumstances may well provide Family Dollar with an affirmative defense to Plaintiff's undercharge claim. It is clear, however, that this Court, without the administrative advice of the ICC, cannot in this undercharge case entertain any equitable defenses advanced by Family Dollar. If this case is not referred to the ICC, the result that this Court will be constrained to enter is inexorably certain: The filed rate will be applied. Referral to the ICC, however, will enable this Court to retain final authority over the matter, 28 U.S.C.A. § 1336(b) (West Supp. 1987), and possibly allow it to consider any equitable defenses that the ICC may determine to be appropriate. All that Family Dollar is asking for is a fighting chance. This Court believes that, under the circumstances of this case, Family Dollar deserves that chance.

This Court, however, remains concerned with the lack of legal precedent indicating that a shipper can assert equitable defenses in district court *after* the ICC has advised the Court that such defenses are appropriate. The ICC has in the past issued its advisory opinions with the apparent belief that the courts are free to accept or reject such opinions. *Wakefern Food Corp. v. Southwest Freight Lines, Inc.,* No. MC–C–10991, slip op. at 7 (sending copy of ICC decision to Superior Court of New Jersey, Law Division, Union County). The parties have provided, and research has revealed, however, only one judicial opinion that clearly states that the courts, state and federal, should refuse to enforce undercharge collection claim cases when the ICC has found that practice to be unreasonable. *G.M.W., Inc. v. Certified Parts Corp.,* 1987 Fed.Carr.Cas. (CCH) ¶ 83,302, at 58,342 (Wis.Ct.App.1986) (Sundby, J., concurring).

In *Certified Parts,* Judge Sundby stated: [N]either the federal courts nor the state courts can determine the reasonableness of a practice of a common carrier. It does not follow, however, that the courts cannot refuse to enforce a practice found

by the ICC [on referral] to be unreasonable. I agree with the majority that [defendant], in this action, may not raise an equitable defense to the collection of the undercharge for which [plaintiff] sues *but only because the ICC has not found that the collection of the undercharge is an unreasonable practice.*

*Id.* at 58, 344 (Sundby, J., concurring) (emphasis added); *see Southern Pac. Transp. Co. v. Commercial Metals Co.,* 456 U.S. at 345, 102 S.Ct. at 1821 ("When an administrative agency historically has engaged in comprehensive regulation of an industry's ... practices, the agency's *silence* regarding an affirmative defense based on a violation of those regulations must be deemed significant.") (emphasis added).

If this case is not referred to the ICC, this Court will indeed be faced with virtual administrative silence regarding the appropriateness of equitable defenses under the facts of this case. Thus, referral is appropriate. The ICC is advised, however, to aid this Court in its subsequent review of any ICC advisory opinion rendered in this matter. To this end, the ICC should include in its analysis and opinion any authority which would support this Court in adopting any possible ICC recommendation concerning the availability of equitable defenses to this particular undercharge claim case.

THEREFORE, IT IS ORDERED that this case be TEMPORARILY STAYED while it is on referral to the ICC. This Court will retain jurisdiction over the case in order to review any advisory opinion rendered by the ICC.