**In re BREMAN'S EXPRESS COMPANY, Debtor.**

**BREMAN'S EXPRESS COMPANY, Plaintiff,**

v.

**MITCHELL MILLING CO., INC., Defendant.**

**Bankruptcy No. 84–092.
Adv. No. 86–053.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Oct. 31, 1988.

Michael J. Henny, Ravick, Henny & Wepfer, Pittsburgh, Pa., for plaintiff Breman's Exp. Co.

Dwight L. Koerber, Jr., Kriner, Koerber & Kirk, Clearfield, Pa., for defendant Mitchell Mill. Co., Inc.

Stephen I. Goldring, Pittsburgh, Pa., Asst. U.S. Trustee.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

This Court is cognizant of the substantial appellate precedent creating and setting in concrete the "filed rate doctrine". This Court is also aware of its duty to comply

with the directives and precedent tendered by courts having superior status. However, the recent overhaul of the Interstate Commerce Act demonstrates that deregulation was and is the Congressional mandate. Congress decided to sanction the flexibility of deregulation and to supplant the rigidity of regulation. The spirit of the overhaul revolves around a freedom of the parties to negotiate, and the possibility and availability of quick change in a previously filed tariff to meet competition.

Coupling the above with the · curious facts in the case in question, this Court is constrained from believing that appellate courts would determine, under these facts, that equitable considerations and ordinary contract law should not be permitted to govern. Promises were made and assurances given that the changes in rate were appropriate. Defendant clearly relied upon these assurances, and when tendered a statement, Defendant promptly honored same. No explanation is offered for the failure of the Debtor to act by reducing the tariff. At best, this inaction was a default of monumental proportion; at worst, this was a conspiracy to cheat and defraud.

This proceeding involves regulated interstate shipments for which the rates originally charged were less than the lawful tariff rates on file with the Interstate Commerce Commission ("ICC"). Breman's Express Company ("Breman's"), through its authorized agent, Carrier Credit and Collection ("CCC"), seeks to collect $15,731.65 in undercharges from Mitchell Milling Co., Inc. ("Mitchell"), based upon thirteen (13) shipments carried by Breman's during 1982 and 1983.

This case was referred to the ICC on January 14, 1987, *In re Breman's Express Company*, 69 B.R. 356 (Bankr.W.D.Pa. 1987). In that Opinion we voiced our concern over the possible conspiracy of fraud which might result if deliberate rate reductions or misquotations could be unequivocally negated by the carrier, with no defense available to the shipper. The ICC issued an advisory opinion on October 14, 1987, wherein it found that collection of the undercharges in this case would constitute

an unreasonable practice. Thereafter, this Court held an evidentiary hearing, and directed the parties to file post-trial briefs. Mitchell contends that this Court should adopt the findings of the ICC as stated, and dismiss Breman's undercharge action. Breman's challenges this argument, stating that the law clearly requires enforcement of its claim for undercharges. Both of the parties, and this Court, have exhaustively researched and analyzed the chronological history of the law on this issue. Based upon said research and analysis, we have determined that upholding the filed rate doctrine with rigidity could potentially place this Court in lock step with a conspiracy of fraud. We are therefore compelled to follow the path we perceive the appellate courts will take in considering equitable defenses, and will rule in favor of Defendant, Mitchell Milling Co., Inc.

## FACTS

Breman's was a motor common carrier engaged in interstate commerce pursuant to the authority of the ICC and was headquartered in Monroeville, Pennsylvania, a suburb of Pittsburgh.

Mitchell is a small business, handling farm, home, lawn, and garden supplies, and is located in the rural mining community of Clearfield, Pennsylvania. Mr. Brinton R. Dickson has owned and operated Mitchell for fifteen (15) years, along with management assistance from one adult son. Dickson's wife and another son also assist in the operation of the family business. Neither Brinton nor his son has any post-secondary education, nor is either trained in the area of transportation/traffic services. Until this adversary proceeding was commenced by the CCC, neither Dickson nor his son knew that a document identified as a "tariff" existed.

Beginning in 1979 Mitchell found a need to transport certain goods and utilized the services of Butler Trucking Company ("Butler"), a local carrier in close physical proximity to Mitchell. Mitchell provided Butler with requested information necessary to allow Butler to obtain transportation authority from the ICC. Other carri-

ers, including Breman's, sporadically solicited Mitchell's business.

In 1982, Raymond Radzyminski ("Radzyminski"), then manager of Breman's local terminal, began to actively solicit Mitchell's traffic. After making several visits, and knowing that any rate quoted would need to be competitive, he proposed carriage rates to Mitchell that were intentionally just below those charged by Butler. Radzyminski first quoted the rate. He then called Breman's headquarters in Monroeville to obtain confirmation of the quoted rates and to supply the main office with all of the information necessary to submit a special tariff supplement to the ICC for publication. After receiving confirmation from headquarters, Radzyminski advised Mitchell of same.

During the years 1982 and 1983 Mitchell employed the services of Breman's for shipments of calcium chloride, soda ash, and soda ash briquettes, which Mitchell sold to the local coal mining industry. Mitchell's traffic of these items averaged one or two 45,000 pound truckloads each week. Butler remained Mitchell's primary carrier; however, Breman's was hired to carry a total of thirteen (13) shipments. These loads constituted "back haul" for Breman's, a valuable commodity which allowed them to avoid the expense of making empty car return trips.

Upon completion of shipment, Breman's presented Mitchell with a freight bill which completely conformed to the quoted rate. Mitchell never asked Breman's for any rebates or special rates, considering only those rates proposed by Radzyminski on behalf of Breman's. Upon receipt of each freight bill, Mitchell promptly tendered payment in full.

Although the rates billed by Breman's and paid by Mitchell were confirmed during negotiations and thereafter by freight bill, the rates were never published with the ICC as special tariff supplements. Radzyminski testified that there was no reason that said supplements could not be filed.

To the contrary, he provided his home office with all of the information necessary to create the special supplements. Radzyminski, the duly authorized agent of the Debtor, clearly expected that the filed rates would be, and in fact were, modified to conform to the agreement he entered into with Defendant. Mitchell was never advised as to the omission of tariff supplements prior to the commencement of this litigation; in fact, Radzyminski gave Mitchell every indication that all was in order to allow the shipments to be properly carried. For reasons unexplained to this Court, Debtor, in this instance and many other instances, failed to fulfill its promise.

In 1983 Mitchell terminated its business relationship with Breman's due to service-related problems. Specifically, Mitchell found that the use of Breman's van trailers was not as cost efficient a means of transporting its goods as was Butler's use of flatbed trailers.

Breman's filed a bankruptcy petition for Chapter 11 reorganization on January 13, 1984. In October of 1984, CCC was authorized by order of Court to audit Breman's freight bills, and when appropriate, to pursue the collection of outstanding accounts. CCC has filed a total of seventy (70) adversary actions, all of which seek collection of undercharges against various shippers. Of that number, thirty-nine (39) were dismissed on the request of Breman's, six (6) were reduced to judgment, thirteen (13) were settled, and eleven (11) are presently held in abeyance, and may be resolved by the outcome of this case.[1]

CCC filed this action on the information and belief that Breman's had not collected, nor had Mitchell paid, the full charges required by the applicable tariffs on file with the ICC, and therefore sought to recover the difference between the amounts previously paid and those sums required under Breman's applicable tariffs. Total charges paid by Mitchell were $8,748.55. The amount which allegedly remains due and

---

1. CCC claims it is also authorized to offset shippers' claims for damages and overcharges, against Breman's claims for undercharges.

owing as an undercharge, pursuant to the applicable tariff, is $15,731.65.

Had Dickson been quoted the actual class rates in effect, he would have had absolutely no cause to continue the negotiation discussions; in fact, Radzyminski testified that had he known Mitchell would be charged the class rate, he would never have commenced active solicitation. Dickson stated that at the *quoted* rates of 184 and 104 cents per hundredweight, Mitchell made only $200–$300 in gross markup per truckload. At the respective *tariff* rates of 599 and 299 cents per hundredweight, Mitchell would have consistently lost substantial sums of money.

## ANALYSIS

The Interstate Commerce Act, 49 U.S.C. § 10701(a) states in pertinent part:

A rate ... classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission ... must be reasonable.

Section 10762(a)(1) of the Act requires all motor common carriers to publish and file tariffs containing their transportation rates with the ICC. Those tariffs then have the force of law, and the carrier and all shippers are bound by them. *Matter of Penn Central Transportation Co.*, 477 F.2d 841 (3rd Cir.1973). The carrier is not only civilly obligated to collect the published rate; it also faces criminal sanctions for knowingly departing from the rate on file. 49 U.S.C. § 11903(a).

The original purpose underlying this strict rule, commonly called the "filed rate doctrine", is the prevention of tariff rate discrimination in favor of large volume shippers through secret agreements. *Pittsburgh, Cincinnati, Chicago & St. Louis Ry Co. v. Fink*, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919); *Louisville & Nashville Railroad Co. v. Maxwell*, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915). *See also, Motor Carrier Audit & Collection Co. v. Family Dollar Stores*, 670 F.Supp. 644 (W.D.N.C.1987). However, in 1980 Congress enacted the Motor Carrier Act for the specific purpose of creating a favorable climate for competition among carriers. This Congressional deregulation of the trucking industry indicates an aggressive attempt to ease the rigidity of the industry and provide a flexible arena in which business people can conduct their affairs. *See, In re Breman's Express Co., Inc., supra.*

The filed rate doctrine, as originally formulated, relies on the assumption that the filed rates are, in fact, reasonable. If the carrier submits a rate for filing, then in fact it is filed; concurrently, if the rate is filed, then it is presumed to be reasonable. Said presumption was appropriate in the past, as the ICC had refused to review filed rates and practices related thereto, or permit shippers to raise their equitable defenses, although it has been within their jurisdiction to do so.

With its adoption of *National Industrial Transportation League—Petition for the Institution of Negotiated Motor Common Carrier Rates, ex parte.* No. MC–177 (October 29, 1986) (hereinafter "Negotiated Rates"), the ICC issued a major policy reversal, announcing its intention to review, on a case-by-case basis, filed rates for reasonableness, and to decide whether undercharge collections in cases asserting negotiated rates would be an unreasonable practice under § 10701(a).

Under the *Negotiated Rates* policy, where a carrier filed a Complaint to recover an undercharge, and the court refered the case to the ICC, based upon its primary jurisdiction, for determination of the availability of equitable defenses, the ICC would decide whether, under all of the relevant circumstances, collection of undercharges would be an unreasonable practice. *E.L. Mustee & Sons Corp. v. Delta Traffic Service Inc.*, No. MC–C–30072, 1988 MCC Lexis 175 (April 13, 1988). When the ICC resolves a question within its primary jurisdiction, the Commission's final determination should be accorded substantial deference and should not be set aside unless it exceeds the ICC's statutory authority or is unsupported by substantial evidence. *Maislin Industries, U.S., Inc. v. Primary*

*Steel, Inc.*, No. 850021–CV–W–JWO, slip. op. (July 22, 1988). *See also, Consolo v. Federal Maritime Commission,* 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *Erickson–Transport Corp. v. ICC,* 728 F.2d 1057 (8th Cir.1984); *Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334 (1st Cir.1970). If the Commission departs from its former policy in resolving an issue within its primary jurisdiction, as it has in the instant case, it must adequately explain its change of policy in a manner sufficient to permit judicial review of its policies. *Maislin Industries, supra; Seaboard System Railroad, Inc. v. United States,* 794 F.2d 635 (11th Cir.1986); *Intercity Transportation Co. v. United States,* 737 F.2d 103 (D.C.Cir.1984).

*Negotiated Rates* was intended to temper the harsh effects of the filed rate doctrine when it could be shown that the shipper and carrier negotiated and agreed on a rate that was not published in a tariff. Such a showing has elements of contract law (i.e. offer, acceptance, performance, reliance). *Sewell Plastics Inc. v. Highway Express, Inc.,* No. MC–C–30027, 1988 MCC Lexis 31 (January 25, 1988); *Wakefern Food Corp. v. Southwest Freight Lines, Inc.,* No. MC–C–10991, slip. op. (December 23, 1987); *Manufacturer's Consolidation Service, Inc.—Petition for Declaratory Order,* No. MC–C–30025, slip. op. (November 19, 1987). An opinion in favor of Mitchell under the ICC's *Negotiated Rates* precedent requires two (2) basic findings:

  (1) that a rate other than the tariff rate was granted by a carrier representative upon whom the shipper could legitimately rely, and that an agreement to use that rate was reached; and

  (2) that the shipper reasonably relied on the quote.

*Delta Traffic Services, Inc.—Petition for Declaratory Order,* No. MC–C–30055, 1988 MCC Lexis 201 (April 4, 1988); *Sewell Plastics, Inc. v. Highway Express, Inc., supra; Bruard's ,Inc.—Petition for Declaratory Order,* No. MC–C–30039, 1988 MCC Lexis 6 (January 5, 1988); *Wakefern Food Corp. v. Southeast Freight Lines, Inc., supra.*

■ A significant issue in proceedings of this nature is the reliance factor—whether there was a reasonable basis for the shipper to rely on the representation made by the carrier's agent/employee. Reliance must be reasonable, and a finding may depend on whether the carrier's representative could reasonably have been assumed to have pricing responsibility. *Artex Int'l, Inc. v. Robinson Truck Lines, Inc.,* No. MC–C–30022, 1988 MCC Lexis 146 (April 1, 1988); *Packerland Packing Co., Inc. v. Maislin Industries, U.S., Inc.,* No. MC–C–30030, 1988 MCC Lexis 107 (February 1, 1988).

■ Breman's agent, Radzyminski, actively solicited the traffic in Mitchell's geographic area, and quoted what he knew to be competitive rates. He called Breman's headquarters and received confirmation of same. Mitchell relied on Radzyminski's authority and accepted the quoted rates, paying for the transportation services at said rates. Mitchell further relied on Breman's to take whatever steps were necessary to properly implement the quoted rates. Mitchell's reliance was reinforced by the words and actions of Breman's agent, Radzyminski. Under these circumstances, Breman's failure to implement the rates, despite Mitchell's lack of diligence, should preclude Breman's later collection of undercharges. There is no evidence that Mitchell agreed to pay any more than the amount Breman's originally quoted and billed for each shipment. There is no evidence that Breman's ever demanded additional sums over the amounts it billed at any time during its business relationship with Mitchell. But for Breman's negotiated rate, Mitchell would not have used it for these shipments, as the traffic could have been moved competitively by the other carriers Mitchell was using. In fact, Breman's agent would not have solicited Mitchell's business without confirmation of those rates. Mitchell's failure to discover that the quoted rates were not published in tariffs does not negate the existence of the

quoted rates or preclude us from applying the policy of *Negotiated Rates.*

The filed rate doctrine was originally a protective measure and was not meant to create windfall profits for carriers. If both parties anticipated the application of the negotiated rate, and we force the implementation of the filed rate, the carrier becomes unjustly enriched and the shipper is unjustly penalized. We find that Mitchell reasonably believed that the amounts quoted and billed by Breman's were the correct total charges for the transportation services performed, that the amounts were reached as the result of the negotiations between Mitchell and Breman's, and that since full payment was made by Mitchell, Breman's is equitably entitled to collect no more.

Before examining Plaintiff's arguments in opposition to our position that the filed rate doctrine must be relaxed to allow the advancement of equitable defenses, we need to examine Plaintiff's own actions in seeking a more flexible reading of the Motor Carrier Act. As stated earlier, Plaintiff filed seventy (70) adversary actions seeking to recover unpaid freight charges pursuant to the filed rate doctrine. Of those seventy cases, only six (6) have been reduced to judgment. Thirteen (13) of these actions were settled and dismissed upon Plaintiff's motion. Yet the Elkins Act, 49 U.S.C. § 11903(a), which Plaintiff alleges must be rigidly followed, makes a criminal action of *any* attempt to charge, pay, or receive less than the tariff rate. Numerous courts, both prior to deregulation and after, have held that settlements of any charges, other than overcharges, constitute a violation of the Act. *See, Chicago, Burlington & Quincy Railroad Co. v. Ready Mixed Concrete Co.,* 487 F.2d 1263, 1267–8 (8th Cir. 1973); *Matter of Penn Central Transportation Co., supra; Atchison, Topeka and Santa Fe Railroad Co. v. Bouziden,* 307 F.2d 230, 235 (10th Cir.1962); *Consolidated Rail Corp. v. Standard Milling Co.,* 508 F.Supp. 277, 279 (W.D.N.Y.1981); *Baker v. Southeastern Michigan Shippers Co-operative Association,* 376 F.Supp. 149, 153 (E.D.Mich.1973); *Chicago and Northwestern Railway Co. v. Union Packing Co.,* 326 F.Supp. 1304, 1308 (D.Neb.1971). Plaintiff's settlement of numerous actions is just as much a departure from precedent as this Court's present decision. Rather than being unlawful, however, we see both activities as reflections of the increased flexibility occurring since the deregulation of the trucking industry began to blossom.

Returning to Plaintiff's arguments, we find their reliance on *Square D. Co. v. Niagra Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) to be misplaced. In *Square D,* the Court affirmed *Keogh v. C & N. W. Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), which held that treble damages were not available in antitrust actions against carriers, even where the carrier conspired to fix rates in violation of the Sherman Act, since the rates had been approved by the ICC. In *Square D* the rates strictly enforced by the Court were presumptively reasonable because they had been approved by the ICC. *Square D* had nothing whatsoever to say about rates deemed to be unreasonable, or the collection of certain rates being deemed an unreasonable practice, by the ICC. *Tucker Freight Lines v. United Exposition Service Inc.,* 85 B.R. 426 (W.D.Mich.1988). Those portions of *Square D* reaffirming the position that carriers must file their rates, do not determine that we lack the authority to find, in an appropriate case, that allowing a carrier to collect the tariff rate would be an unreasonable practice. *Auto Specialties Mfg. Co., et al.—Petition for Declaratory Order,* No. MC–C–30007, 1988 MCC Lexis 81 (February 16, 1988); *Primary Steel, Inc. v. Maislin Industries, U.S., Inc.,* No. MC–C–10961, 1988 MCC Lexis 13 (January 12, 1988), *aff'd by summary judgment, sub nom., Maislin Industries, U.S., Inc. v. Primary Steel, Inc., supra; Manufacturer's Consolidation Service, Inc.—Petition for Declaratory Order, supra.*

Plaintiff directs this Court's attention to the recent decision by Judge Murphy of the U.S. District Court of Minnesota, *INF Ltd. v. Spectro Alloys Corp.,* 690 F.Supp. 808 (D.Minn.1988), wherein the Debtor, a motor

common carrier, was granted summary judgment after return of an ICC advisory opinion, holding 3–2, to allow the shipper's equitable defenses. We find that case distinguishable.

Initially we note that the opinion by the ICC in the case at bar was issued by *unanimous* decision. In *INF Ltd.—Petition for Declaratory Order*, No. MC–C–30041, 1988 ICC Lexis 23 (February 23, 1988), the ICC was bitterly divided; not on the legal issues before it, but rather on the application of the *Negotiated Rates* precedent to the facts in that particular case. Commissioners Gradison and Simmons, in their dissents, clearly indicated that the factual scenario in *INF Ltd.* did not fall within the parameters of *Negotiated Rates*. There, the question centered upon which of two properly filed tariffs was applicable to certain transportation. Spectro Corporation sought to ship aluminum, and was quoted a rate for "iron and steel", when it should have been quoted the higher "class" rate. In his dissent, Chairman Gradison stated as follows:

> The shipper knew that the tariff existed and was assured that it would be the basis of the charges ...*The record simply does not establish that the carrier quoted a rate other than a filed tariff rate.* Accordingly, the question is whether it was reasonable ...for the shipper to have relied on the carrier's interpretation of a filed rate ...There is no reasonable argument that an iron and steel tariff applies to aluminum articles.

*INF Ltd., supra.* (emphasis added).

Judge Murphy also noted that Commissioner Simmons' dissent reiterated that *Negotiated Rates* was to apply only where a *negotiated* and *unpublished* rate was employed. *INF Ltd.*, slip. op. at 6. Given the tenuous majority decision of the ICC, and the impassioned dissent, asserting that the issue was outside the ICC's unreasonable practice jurisdiction and its decision in *Negotiated Rates*, Judge Murphy correctly followed the precedent of the filed rate doctrine. Such a rationale is not appropriate, however, in the case at bar. Our factual scenario is "on all fours" with the *Negotiated Rate* precedent—we are dealing with a *negotiated* and *unpublished* rate.

Additionally, we note Judge Murphy's concern about departure from the filed rate doctrine "...on such a closely divided administrative decision in this *fluctuating* area of law." *Id.* at 7 (emphasis added). Judge Murphy then refers to the ICC's proposal to study and modify *Negotiated Rates. See, NITL—Petition for Declaratory Order on Negotiated Motor Common Carrier Rates*, No. MC–C–30090, 1988 MCC Lexis 226 (April 14, 1988). As the general meaning associated with "fluctuating" is a "see-saw", pendulum-type of motion, we disagree with her characterization of the ICC's position. Upon review of the above-mentioned proposal, it is clear that the ICC is considering a forward progression, as opposed to any measured retreat from *Negotiated Rates.*

The Declaratory Order proceeding, cited above, upon which comments recently closed, would establish the ICC's plenary and exclusive jurisdiction over issues of reasonableness, and would make such findings *binding* upon the courts, if not timely appealed or if affirmed on appeal. Acknowledging its authority "...to issue a declaratory order to terminate a controversy or remove uncertainty," 5 U.S.C. § 554(e), the ICC is presently exploring this possibility. All indications lead this Court to believe that the ICC is pressing forward to battle the unreasonable practice at hand.

The Courts have never held that the ICC lacks the authority to prohibit the unreasonable collection of undercharges. Instead, the ICC has refused, in the past, to exercise that authority. The filed rate doctrine and the reasonable practices doctrine are *both* mandated by statute, and while they may at times conflict, it is not for this Court or any other to place enforcement of one doctrine above the other. They must be permitted a peaceful coexistence, with each controlling in its appropriate circumstances.

There are compelling policy considerations which fully support the ICC's decision to ease the rigidity of enforcement of filed

rates. Since the deregulation of the motor carrier industry in 1980, and the subsequent bankruptcy filings of *numerous* carriers, it is apparent that carriers have been regularly charging shippers less than the filed rate. In this case alone, Breman's filed seventy (70) adversary complaints to collect alleged undercharges. We are advised that in the *McLean Trucking Company* case, C–B–86–00023 (W.D.N.C.), in excess of 1,000 rate undercharge actions have been filed. We are certain that these are not isolated incidents. It appears as though negotiated rates and lack of tariff supplementation occurred as a measured plan of action by this and other carriers, a war of competition lost by those filing bankruptcy petitions. Had bankruptcies not been filed, these carriers would not have sought recovery of these undercharges. To do so now sounds very much like fraud. As we stated previously in our decision to refer the case to the ICC:

> Congress and the ICC seek to rectify an atmosphere wherein actual fraud might be perpetuated within legal boundaries. This Court cannot and will not condone such a fraud ...; nor do we believe that the appellate courts will endorse such a fraud, in light of the practices which have arisen in the aftermath of this deregulation.

*In re Breman's Express Company, supra* at 359.

An appropriate Order will be issued.

### ORDER OF COURT

AND NOW at Pittsburgh in said District this 31st day of October, 1988 in accordance with the foregoing Memorandum Opinion of this same date, it is hereby ORDERED, ADJUDGED and DECREED that judgment is entered for the Defendant.