### In re TOTAL TRANSPORTATION, INC., Debtor.

**Thomas F. MILLER, Trustee for Total Transportation, Inc., Plaintiff,**

v.

**ARMOUR AND COMPANY, Defendant.**

**ARMOUR AND COMPANY, Plaintiff,**

v.

**Thomas F. MILLER, Trustee for Total Transportation, Inc., Defendant.**

Bankruptcy No. 4–85–1909.

Adv. No. 4–87–233.

Civ. No. 4–88–24.

United States District Court, D. Minnesota, Fourth Division.

March 18, 1988.

Jerold A. Gilbert, Minneapolis, Minn., for Armour and Co.

Paul O. Taylor, Paul O. Taylor & Associates, Minneapolis, Minn., for Thomas F. Miller, Trustee for Total Transp.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiff Armour and Company's motion for leave to appeal the order of the bankruptcy court denying its motion for reference of a tariff dispute to the Interstate Commerce Commission (ICC). Armour's motion will be granted but the Court declines to refer the matter to the ICC.

## FACTS

The debtor Total Transportation, Inc. (Total) was formerly a motor common carrier pursuant to a certification of public convenience by the ICC. In late 1984 through 1985 Total contracted with the defendant corporation Armour and Company (Armour) to haul Armour products between various locations in the United States. In late 1985 Total ceased operations as a result of an involuntary bankruptcy proceeding filed against it. In August 1987 the bankruptcy estate conducted an audit of Total's freight bills to determine whether it had properly charged its customers in accordance with rates under the tariffs on file with the ICC. The results of the audits indicated that Total had charged its customers less than the filed rates. The auditors concluded that Armour owed the bankruptcy estate additional freight charges in the amount of $9,046.69 due to undercharges in connection with certain shipments. Armour then filed a motion before the bankruptcy court for reference of this matter to the ICC for a determination of the reasonableness of the rates and practices involved in the Armour shipments by Total. The bankruptcy court summarily denied Armour's motion in an order dated December 17, 1987. Armour now moves the Court for leave to appeal this interlocutory order pursuant to 28 U.S.C. § 158(a) and requests that the Court refer the matter to the ICC. The defendant/trustee of the bankruptcy estate opposes Armour's motion.

## DISCUSSION

Appeals of interlocutory bankruptcy court orders are governed by 28 U.S.C. § 158(a) which provides:

> The district courts ... shall have jurisdiction to hear appeals ... with leave of the court, from interlocutory orders and decrees, of bankruptcy judges....

Because the statute itself provides no guidance on how district courts should exercise their discretion in determining whether or not to exercise jurisdiction over interlocutory orders, courts construing the provision have used the same standards contained in 28 U.S.C. § 1292(b) which governs the jurisdiction of the courts of appeals over interlocutory orders of the district courts. *See, e.g., In re Bertoli*, 58 B.R. 992, 995 (D.N.J. 1986), *aff'd*, 812 F.2d 136 (3d Cir.1987); *In re Johns-Manville Corp.*, 45 B.R. 833, 835 (S.D.N.Y.1984). Those standards require

that (1) the interlocutory order involve a controlling issue of law as to which there is substantial ground for difference of opinion; and (2) permitting an immediate appeal would materially advance the ultimate termination of the litigation.

A. *Controlling Issue of Law and Advancement of Ultimate Termination of Bankruptcy Proceedings*

■ The Interstate Commerce Act, 49 U.S.C. § 10762(a)(1) requires all motor common carriers to publish and file tariffs containing their transportation rates with the ICC. Once a carrier publishes and files a tariff with the ICC, the tariff has the force of law and the carrier and all shippers are bound by it. *Lowden v. Simonds–Shields–Lonsdale Grain Co.*, 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939); *Aero Trucking, Inc. v. Regal Tube Co.*, 594 F.2d 619 (7th Cir.1979). The carrier is then obligated to collect the rate published in its tariff. *See* 49 U.S.C. § 10761(a). Not only is the carrier required by civil statute to charge and collect the filed rate, but the Elkins Act of 1903, 49 U.S.C. § 11903(a), also makes it a criminal offense to knowingly depart from the rate on file. This rule of law known as the "filed rate" doctrine operates as an ultimate marketplace rule of caveat emptor, caveat venditor. "Deviation from it is not permitted upon any pretext.... Ignorance or misquotation of rates is not an excuse for either paying or charging less or more than the rate filed." *Louisville & Nashville R.R. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *Southern Pacific Transp. Co. v. Commercial Metal Co.*, 456 U.S. 336, 343, 102 S.Ct. 1815, 1820, 72 L.Ed. 2d 114 (1982); *Missouri Pacific R.R. Co. v. Rutledge Oil Co.*, 669 F.2d 557, 558 (8th Cir.1982). The purpose underlying this strict rule is the prevention of tariff rate discrimination in favor of large volume shippers through secret agreements. *Commercial Metal Co.*, 456 U.S. at 343–44, 102 S.Ct. at 1820–21; *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink*, 250 U.S. 577, 581, 40 S.Ct. 27, 63 L.Ed. 1151 (1919). The trustee, relying on the filed rate doctrine, urges the Court to deny Armour's leave to appeal on the grounds that Armour has no defense to the collection of undercharges.

Armour, however, relies on 49 U.S.C. § 10701(a) which provides in relevant part:

A rate ..., classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission ... must be reasonable.

Armour contends that the collection of the filed rate, rather than the quoted rate, would be unreasonable. Armour further contends that the determination of whether collection of the filed rate would be reasonable is a question that lies within the primary jurisdiction of the ICC and accordingly that the dispute should be referred to that agency.

Primary jurisdiction is a judicial doctrine "concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pacific R.R.*, 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). *See generally*, K. Davis, 4 *Administrative Law Treatise*, § 22.1 (2d ed. 1983). The doctrine applies when a court must decide issues "which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Western Pacific*, 352 U.S. at 64, 77 S.Ct. at 165. If the doctrine applies the proper course is for the court to suspend the action "pending referral of such issues to the administrative body for its views." *Western Pacific*, 352 U.S. at 64, 77 S.Ct. at 165; *see also Iowa Beef Processors, Inc. v. Illinois Central Gulf R.R. Co.*, 685 F.2d 255, 259 (8th Cir. 1982). The ICC has primary jurisdiction over all questions which raise "issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by th[e] [Interstate Commerce] Act." *Western Pacific*, 352 U.S. at 65, 77 S.Ct. at 166. The determination of whether a rate or practice is reasonable is an issue which lies within the primary jurisdiction of the ICC. *Nader v. Allegheny Airlines, Inc.*, 426

U.S. 290, 304, 96 S.Ct. 1978, 1987, 48 L.Ed. 2d 643 (1976); *Western Pacific,* 352 U.S. at 66–67, 77 S.Ct. at 166.

The Court is therefore required to determine the extent to which the filed rate doctrine is modified by the defense that collection of the undercharge would be an unreasonable practice within the meaning of 49 U.S.C. § 10701(a), thereby permitting referral to the ICC under the doctrine of primary jurisdiction. This is a recent issue because historically the ICC has not permitted shippers to raise equitable defenses to undercharge collection proceedings through its jurisdiction over unreasonable rates and practices. *Rebel Motor Freight, Inc. v. Southern Beverage Co., Inc.,* 673 F.Supp. 785, 788 (M.D.La.1987); *Seaboard System R.R., Inc. v. United States,* 794 F.2d 635, 638 (11th Cir.1986). Indeed, as late as 1985 the ICC concluded its unreasonable practice jurisdiction did not give it authority to allow the assertion of a negotiated but unfiled rate as a defense to undercharges. *See Atlas Foundry and Machine Co. v. IML Freight, Inc.,* ICC Docket No. MCC–10942 (May 16, 1985), *cited in* Goodman, *Unfiled Motor Common Carrier Rates Gain New Respectability As the ICC Celebrates Its Centennial,* (hereinafter *Unfiled Rates*) 54 Transp.Pract.J. 292, 302 (1987).

In 1986, however, the ICC announced, in a major policy reversal, that it would in some circumstances use its unreasonable practice jurisdiction under 42 U.S.C. § 10701(a) to recommend equitable relief against what would otherwise be an automatically mandated collection of undercharges in the motor carrier context. *See National Industrial Transportation League —Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates: Ex Parte No. MC–177,* 1986 Fed. Carr.Cas. (CCH) par. 37,284 (1986) (*Ex Parte No. MC–177*). The ICC's policy reversal was based on its conclusion that the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 "dramatically altered the competitive atmosphere of the motor carrier industry." *Ex Parte No. MC–177,* 1986 Fed.Carr.Cas. at 47,351. As a result of the "intense, new competition" leading to widespread daily negotiation of rates, the ICC concluded a new approach was needed to formulate a regulatory response to the increasingly common practice of a negotiated but unfiled rate being used.[1] The ICC concluded that "in particular circumstances it would be fundamentally unfair not to consider a shipper's equitable defenses to a claim for undercharges.... [T]he filed rate doctrine was not intended to condone or reward carriers ... where carrier actions may constitute fraudulent business practices." *Ex Parte No. MC–177,* 1986 Fed.Carr.Cas. at 47,350.

Despite the ICC's conclusion that it could extend its unreasonable practice jurisdiction into an entirely new domain, it also recognized that its authority with respect to equitable defenses was limited. Thus, it acknowledged it lacked initial jurisdiction to entertain challenges to rates charged in the past or to order the waiver of undercharges. *Ex Parte MC–177,* 1986 Fed. Carr.Cas. at 47,352. Rather, it defined its role as limited to providing courts, upon referral and at their request, with an advisory opinion on whether the shipper should be entitled to assert equitable defenses to the collection of undercharges. *Ex Parte MC–177,* 1986 Fed.Carr.Cas. (CCH) at 47,-352. Subsequently, it has ruled that a shipper can assert equitable defenses by showing: "(1) that a rate other than the tariff

**1.** The Motor Carrier Act of 1980, Pub.L. 96–296, 94 Stat. 793 sought to increase competition in the motor carrier industry. *Niagara Frontier Tariff Bureau, Inc. v. United States,* 826 F.2d 1186, 1189 (2d Cir.1987). One of the key provisions of the Act was designed to facilitate entry of new carriers and expansion of existing carriers in the industry (section 5—amending 49 U.S.C. § 10922). The effect on competition was dramatic: the Chairman of the ICC testified that by 1985 there were 35,000 regulated motor common carriers, an increase of more than 100 percent from the 17,000 carriers in 1980. Goodman, *Unfiled Rates,* 54 Transp.Pract.J. at 300. Thus there is no doubt that implementation of the Act dramatically increased competition and price-cutting activity, dooming many carriers to bankruptcy and forcing other carriers to engage "in a frenzy of rate-cutting to stave off the bankruptcy." Goodman, *Unfiled Rates,* 54 Transp.Pract.J. at 296–97.

rate was quoted by a carrier representative upon whom the shipper could legitimately rely and that an agreement to use that rate was reached; and (2) that the shipper reasonably relied on the quote." *Wakefern Food Corp. v. Southwest Freight Lines, Inc.*, 1987 Fed.Carr.Cases (CCH) # 37,350 at 47,589.

Conversely, it is important to note that without referral to the ICC, courts themselves are powerless to order waiver of undercharges; they are bound by statute and Supreme Court precedent to compel payment of the filed rate. *See Motor Carrier Audit & Collection Co. v. Family Dollar Stores, Inc.*, 670 F.Supp. 644, 649 (W.D.N.C.1987) ("[i]f this case is not referred to the ICC, the result that this Court will be constrained to enter is inexorably certain: The filed rate will be applied"). Avoiding the strictures of the filed rate doctrine thus requires both the courts and the ICC to engage in a concerted pas de deux. Courts have subsequently divided on the propriety of referral to the ICC for a recommendation of whether a shipper can assert equitable defenses to undercharge collections. *Compare, e.g., Rebel Motor Freight, Inc. v. Southern Beverage Co.*, 673 F.Supp. 785, 789–80 (M.D.La.1987) (referral inappropriate) *with Motor Carrier Audit & Collection Co. v. Family Dollar Stores, Inc.*, 670 F.Supp. 644, 649 (W.D.N.C.1987) (referral appropriate). Thus, there is a controlling question of law upon which there is a substantial ground for difference of opinion. Moreover, the Court also concludes that early resolution of this issue would materially advance the ultimate termination of the bankruptcy proceeding by precluding later piecemeal appeals by other shippers and mitigating hardship to Armour. The Court will therefore entertain Armour's appeal.

## B. *Propriety of Referral to the ICC*

■ The majority of courts have concluded that referral of undercharge disputes to the ICC when equitable defenses may exist is proper in light of *Ex Parte MC–177*.[2] In so concluding they have relied, as did the ICC itself in adopting *Ex Parte MC–177*, on the decision of the United States Court of Appeals for the Eleventh Circuit in *Seaboard System R.R., Inc. v. United States*, 794 F.2d 635, 638 (11th Cir.1986). *Seaboard* involved an analogous issue of equitable defenses to undercharge collection in the context of rail carriers. At issue was which of two rates applied to certain rail shipments, which in turn depended on how a bracket mark in a tariff should be interpreted. *Seaboard*, 794 F.2d at 636–37. Despite its prior statement to the shipper that the lower multi-car rate applied, the rail carrier subsequently brought suit in federal district court to collect undercharges based on a higher single car rate. The shipper then filed an administrative complaint with the ICC, contending that collection of the undercharge would be an unreasonable practice. *Seaboard*, 794 F.2d at 639. The shipper also moved the district court to stay its action pending the resolution of the administrative complaint and the district court issued the stay. Subsequently, the ICC ordered that it would be an unreasonable practice to permit the collection of undercharges on the facts before it. *Seaboard*, 794 F.2d at 636. The *Seaboard* court concluded the ICC acted within its authority in so ruling because the filed rate doctrine was a judicial and not an administrative rule:

The Commission's action in this case is both justified and within its jurisdiction.

**2.** *See, e.g., INF, Ltd. v. Spectro Alloys Corp.*, 651 F.Supp. 1405, 1407–08 (D.Minn.1987); *Motor Carrier Audit Collection Co. v. Family Dollar Stores, Inc.*, 670 F.Supp. 644, 649–50 (W.D.N.C. 1987); *Indiana Harbor Belt R.R. Co. v. Industrial Scrap Corp.*, 672 F.Supp. 1041, 1042 (N.D. Ill.1986); *Maislin Transport Ltd. v. House of Wines, Inc.*, Civil No. 84–2831 (D.D.C. June 2, 1987) (available on WESTLAW, 1987 WL 12131); *TMBR Drilling Inc. v. Younger Transportation, Inc.*, Civil No. MO–85–CA–020, slip op. at 1–2 (W.D.Tex. Sept. 23, 1987); *RTC Transportation, Inc. v. County Pride Foods, Ltd.*, Civil S–86–1509, Order at 2 (E.D.Ca. July 31, 1987) (available on WESTLAW, 1987 WL 46938); *Delta Traffic Service, Inc. v. Marine Lumber Co.*, 683 F.Supp. 754, 755 (D.Or.1987); *Breman's Express Co. v. H & H Distributing Co.*, 69 B.R. 356, 369 (Bankr. W.D.Pa.1987); *In re Tobler Transfer, Inc.*, 74 B.R. 373, 377 (Bankr.C.D.Ill.1987).

It is not contrary to *Maxwell* and related cases, as those cases dealt only with the *courts'* authority to grant equitable defenses to undercharge actions. The Interstate Commerce Act, as amended, still embodies the policies of non-discrimination and uniformity. The primary authority to give effect to those policies, though, is reposed in the ICC.... Nothing prohibits the ICC from changing its policy on enforcing the "unreasonable practice" provision of section 10701(a).... The Commission did not abolish the requirement of 49 U.S.C.A. § 10761(a) that carriers must charge the tariff rate. The statute does not say what remedy is available if less than the tariff rate has in fact been charged and paid for past shipments. That has been worked out by Commission and judicial decision.

794 F.2d at 638.

A significant minority of courts, however have concluded referral to the ICC is inappropriate.[3] The rationale for their conclusion is twofold. First, the long history of the filed rate doctrine strongly suggests the doctrine should not be abandoned or undermined without explicit congressional approval. *Rebel Motor*, 673 F.Supp. at 790; *Motor Carrier Audit & Collection Co. v. United Food Service Inc.*, Civil No. 87–C–298, slip op. at 8 (D.Colo. May 4, 1987) (available on WESTLAW, 1987 WL 19008). Consequently, the ICC's conclusion that the Motor Common Carrier Act of 1980 authorized it to consider equitable defenses is suspect. Second, even if the ICC can jurisdictionally give courts advisory opinions about the availability of equitable defenses in appropriate cases, a serious question exists whether the courts are free to disregard statutes and explicit Supreme Court precedent mandating adherence to the filed rate.

*See Kaiser Aluminum*, slip op. at 9; *Motor Carrier Audit*, slip op. at 6–7.

*Square D Co. v. Niagara Frontier Traffic Bureau*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) strongly supports the conclusion that the ICC cannot construe the Motor Common Carrier Act of 1980 as giving implicit congressional approval to undermine the filed rate doctrine in order to meet changed conditions in the carrier industry. In *Square D* the Supreme Court refused to overrule *Keogh v. Chicago and Northwestern Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) which held that private shippers could not bring a treble-damages antitrust action for damages resulting from tariffs fixed by conspiracy *if* those tariffs were filed with the Commission. 260 U.S. at 162, 43 S.Ct. at 49. The *Keogh* decision rested on the rule that once the tariff was filed "[t]he rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." 260 U.S. at 163, 43 S.Ct. at 49. Significantly, the *Square D* Court recognized that *Keogh* was inconsistent with the 1980 Motor Common Carrier Act and that overruling it would in fact promote the pro-competitive goals of the Act; nonetheless the Court concluded it was powerless to act:

We may assume ... that the *Keogh* decision was unwise as a matter of policy— but it nevertheless remains true that Congress must be presumed to have been fully cognizant of this interpretation of the statutory scheme, which had been a significant part of our settled law for over half a century, and that Congress did not see fit to change it when Congress carefully reexamined this area of the law in 1980. *Petitioners have pointed to no specific statutory provision or legislative history indicating a specific congressional intention to overturn the longstanding* Keogh *construc-*

3. *See Rebel Motor Freight, Inc. v. Southern Beverage Co.*, 673 F.Supp. 785, 789–80 (M.D.La. 1987); *West Coast Truck Lines, Inc. v. Kaiser Aluminum & Chemical Co.*, Civil No. C–87–0048, slip op. at 6–8 (N.D.Ca. July 29, 1987) (available on Westlaw, 1987 WL 46871); *Motor Carrier Audit and Collection Co. v. United Food Service*, Civil No. 87C298 (D.Colo. May 4, 1987) (Westlaw); *Feldspar Trucking Co. Inc. v. Greater Atlan-*

*tic Shippers Associates, Inc.*, 683 F.Supp. 1375, 1378 (N.D.Ga.1987); *In re Taynton Freight Systems*, 76 B.R. 971, 973 (Bankr.M.D.Pa.1987); *In re Oneida Motor Freight Inc.*, Bankr. No. 85–03606, slip op. at 10–12 (Bankr.N.J. Oct. 19, 1987). *See also G.M.W., Inc. v. Certified Parts Corp.*, 135 Wis.2d 503; 400 N.W.2d 512, 515 (1986) (refusing to permit shipper to raise equitable defense to collection of filed rates).

*tion; harmony with the general legislative purpose is inadequate for that formidable task.*

106 S.Ct. at 1928 (emphasis added, footnotes omitted).[4]

In addition to their reliance on *Square D* the minority courts have also rejected the *Seaboard* decision as authority for referral of undercharge disputes to the ICC because *Seaboard* did not involve referral. Instead, it involved an order issued as a result of an administrative complaint filed by the shipper with the ICC. *See, e.g., United Food Service*, Civil 87–C–29, slip op. at 5; *Feldspar*, Civil C–87–57–5A, slip op. at 5–6. Thus, even if the ICC might have jurisdiction to issue orders concerning equitable defenses in administrative complaint proceedings, those courts have concluded that they would be unable to accept advisory opinions of the ICC resulting from referrals. On balance, the Court concludes the reasoning of the minority courts is compelling. It therefore concludes that referral is inappropriate unless precedent from the United States Court of Appeals for the Eighth Circuit dictates otherwise.

The position of the Eighth Circuit on this issue is unclear. The Eighth Circuit recently interpreted *Square D* as reaffirming "the overriding nature of the tariff in relationships between shippers and carriers." [5] *Paulson v. Greyhound Lines, Inc.*, 804 F.2d 506, 507 (8th Cir.1986). However, in *Inman Freight Systems, Inc. v. Olin Corp.*, 807 F.2d 117, 119–20 (8th Cir.1986)

the Eighth Circuit in dicta impliedly assumed the ICC's ability to use its unfair practice jurisdiction to consider equitable defenses:

> We note the ICC's new [*Ex Parte MC–177*] policy does not apply directly to this case.... The parties do not argue here that a negotiated rate was unpublished but instead question the application of the lower published rate to the shipments in question. *Accordingly, we do not refer this case to the ICC for possible application of its new policy.*

807 F.2d at 120 (emphasis added). Significantly, the issue of whether *Ex Parte MC–177* was consistent with the filed rate doctrine was not before the *Inman* court nor is there any indication that the *Inman* court was aware that the issue existed.

One court has read *Paulson* as precluding referral. *See Rebel Motor*, 673 F.Supp. at 790. Another court has viewed *Inman* as approving referral of undercharge disputes to the ICC. *See Delta Traffic Service Inc. v. Marine Lumber*, Civil 86–1124, slip op. at 6 (D.Or. May 21, 1987). The Court finds that Eighth Circuit precedent does not preclude the Court from rejecting the argument advanced by Armour.

It is also important to note that the court in *INF, Ltd. v. Spectro Alloys Corp.*, 651 F.Supp. 1405, 1407 (D.Minn.1987) referred an undercharge dispute to the ICC, relying on both *Seaboard* and *Ex Parte MC–177*. *Spectro Alloys*, however, did not involve

---

**4.** It should be noted that in *Ex Parte MC–177* the ICC concluded that *Square D* did not preclude it from considering equitable defenses to undercharge proceedings:

> *Square D* [did not involve] the question of equitable defenses to a claim for undercharges, and [it does not indicate] that the Commission is precluded from passing on the reasonableness of carrier practices pursuant to its express statutory authority in Section 10701(a). Further ... we are not abolishing the requirements of section 10761. Thus the portions of *Square D* reaffirming that carriers must *file* their rates do not mean that we lack authority to find, in a particular case, that allowing a carrier to *collect* the tariff rate would be unreasonable.

*Ex Parte MC–177*, 1986 Fed.Carrier Cases at 47,352–353. For reasons discussed *infra* at 597,

the Court finds this reasoning to be unpersuasive.

**5.** *Paulson* involved the issue of whether a carrier could be held to an oral warranty that a package would arrive at a designated time when the tariff on file explicitly stated the carrier could not make any such guarantees. 804 F.2d at 507. The *Paulson* court concluded that because the shipper was legally presumed to know the tariff provisions, no warranty could have been made. 804 F.2d at 507. In so holding, the court reaffirmed the filed rate doctrine as well:

> Congress passed the tariff requirement to prevent discrimination by common carriers.... By not allowing any promises or prices outside the tariff, the law ensures that all shippers will receive the same services for the same price.

*Paulson*, 804 F.2d at 508.

deviations from a filed rate, but a dispute over which rate should have applied to a particular metal shipment. The shipper raised the equitable defense that because both parties in good faith believed the steel/iron rates applied, it would be an unreasonable practice for the bankrupt estate to later contend a higher rate was applicable. Although the court noted that *Ex Parte MC–177* was not entirely on point, it concluded referral was appropriate "[u]nder the circumstances of this case, and in the context of the changing legislative and regulatory scheme." *Spectro Alloys*, 651 F.Supp. at 1407. To the extent *Spectro Alloys* is inconsistent with the Court's decision in the case at bar, the Court respectfully differs with the rationale of that case.

The Court therefore concludes the minority of courts are correct that the filed rate doctrine precludes shippers from asserting equitable defenses to undercharge proceedings. As *Square D* indicates, the deregulatory impetus behind the Motor Carrier Act of 1980 cannot be construed as implicit congressional approval to abolish or amend the filed rate doctrine through the ICC's creative use of previously untapped jurisdictional sources. While the ICC has correctly noted that *Square D* does not explicitly state that the ICC cannot use its unreasonable practice jurisdiction to do so, the tenor of the opinion is that it cannot. *See International Brotherhood of Teamsters v. I.C.C.*, 801 F.2d 1423, 1429–30 (D.C.Cir. 1986) (citing *Square D* in concluding that the pro-competitive policies embodied in the MCA could not justify an ICC reinterpretation of statutory language governing rail carrier acquisitions) *rev'd in light of superseding legislation*, 818 F.2d 87, 89 (D.C. Cir.1987).

Further, a review of the Act's legislative history supports the view that Congress did not intend to undermine the filed rate doctrine. It is apparent that Congress wanted competition, rather than governmental regulation to determine motor carrier tariffs. *I.C.C. v. American Trucking Associations, Inc.*, 467 U.S. 354, 367, 104 S.Ct. 2458, 2465, 81 L.Ed.2d 282 (1984); H.Rep. 96–1069, 96th Cong. 2d Sess. 10, 24–26, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2283, 2292, 2306–08. Thus, section 11 of the Act restricted the ability of the ICC to declare proposed rates unreasonable by creating a "zone rate of freedom" for rates which fall within a specified percentage range of statutory points of reference. *See* 49 U.S.C. §§ 10708(d)(1)(B), (d)(4)(B). Section 14 of the Act similarly divested the ICC's ability to disapprove or approve of rate bureau agreements by creating a presumption that rate bureau agreements meeting ICC guideline are entitled to antitrust immunity.[6] *American Trucking*, 467 U.S. at 357, 104 S.Ct. at 2460.

However, despite extensive provisions in the Act dealing with motor carrier rates, nowhere did Congress provide the faintest inkling that it viewed the filed rate doctrine as a regulatory anomaly which hampered competition. Indeed, despite its clear intention to reduce governmental regulation of carrier rates through the "zone of rate freedom" and rate bureau provisions, Congress did not intend that government regulation of discriminatory or predatory pricing practices (the chief rationale behind the filed rate doctrine) should also be diminished:

The thrust of [the new zone of rate freedom subsection] ... is to provide for more pricing freedom and less government regulation and to balance freer entry into the industry, freer expansion of the industry, and the additional competition that will result from other provisions of the bill. The concept, then, is to spur

---

**6.** Rate bureaus are groups of motor common carriers which collectively negotiate rates to submit to the Commission for approval. The Reed–Bulwinkle Act of 1948, Ch. 491, 62 Stat. 472 provided antitrust immunity for carriers within the jurisdiction of the Commission who entered into rate bureaus. To be eligible for immunity the bureau had to apply for and receive Commission approval of the bureau agreement detailing how the rates would be negotiated. *See generally, American Trucking*, 467 U.S. at 356, 104 S.Ct. at 2460 (describing rate bureaus).

**598**

competition both in service and in pricing....

*This new latitude carries with it less government involvement, except in the area of discriminatory and predatory pricing.* In these two areas, the Commission's powers remain intact.

*See* H.Rep. 96–1069, 96th Cong. 2d Sess. 12, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2282, 2307 (emphasis added). Thus, Congress did not want regulatory vigilance over discriminatory pricing to diminish. However, the ICC's new rule in fact promotes pricing discrimination by permitting carriers to charge different rates to different customers.

To resolve this case, however, the Court need not go so far as to hold that the ICC cannot lawfully use its unreasonable practice jurisdiction to undercut a doctrine of unquestioned acceptance. It is enough for the Court to note that because it is bound by both statute and Supreme Court precedent to apply the filed rate doctrine it would be unable to accept any advisory opinion by the ICC that a shipper be permitted to avoid the filed rate doctrine through the assertion of equitable defenses. Both the Interstate Commerce and the Elkins Act require the carrier to charge and collect the filed rate. It simply cannot be an unreasonable practice for a carrier to do so, regardless of any private agreement to the contrary.

In so holding the Court recognizes that strong policy reasons may well support the ICC's conclusion that the filed rate doctrine should no longer be rigidly and blindly enforced. The fact that carriers are systematically charging less than the filed rates is compelling evidence that the filed rate doctrine may be unworkable and the law may have to adapt to the reality of changed conditions. But the proper body to address this issue is Congress, not the courts.

Based on the foregoing, and upon review of all the files, records, proceedings and arguments of counsel,

IT IS ORDERED that

1. Armour's motion for leave to appeal is granted; and

2. Armour's motion for referral of this matter to the ICC is denied.