**MAISLIN INDUSTRIES, U.S., INC., et al., Plaintiffs,**

v.

**PRIMARY STEEL, INC., Defendant.**

**No. 85–0021–CV–W–JWO.**

United States District Court, W.D. Missouri, W.D.

July 22, 1988.

David G. Sperry, Blue Springs, Mo., for plaintiffs.

Edward E. Schmitt, Roy R. Darke, Jennifer A. Putman, Dietrich, Davis, Dicus, Rowlands, Schmitt & Gorman, Kansas City, Mo., for defendant; Arthur J. Teichberg, New York City, and Henry M. Wick, Jr., Wick, Rich, Fluke & Streiff, Pittsburgh, Pa., of counsel.

## MEMORANDUM AND ORDERS

JOHN W. OLIVER, Senior District Judge.

### I

#### A.

Plaintiffs filed the above-styled action on January 8, 1985 to collect $187,923.26 in "undercharges" plus interest and costs, relating to 1,081 shipments of steel transported by defendant. On September 3, 1985 we entered orders granting defendant's motion to refer issues of controversy to the Interstate Commerce Commission (ICC) for determination and staying the above-styled action pending final determination by the ICC. *See* September 3, 1985 Order at 5. On January 12, 1988 the ICC issued its

final determination finding that it would be an "unreasonable practice now to require Primary to pay the undercharges." *Primary Steel, Inc. v. Maislin Industries, U.S., Inc.,* No. MC–C–10961, at 10 (ICC January 12, 1988). In so finding, the ICC expressly departed from its former policy which required the collection of undercharges, the difference between the published tariff and the amount charged at the time of shipment, no matter how unfair or unreasonable that might be in a given case.

On April 8, 1988 defendant Primary Steel "pursuant to the decision of the Interstate Commerce Commission in *Primary Steel, Inc. v. Maislin Industries, U.S., Et. Al.,* ICC docket No. MC–C–10961" filed a motion requesting the Court to enter summary judgment in its favor. Plaintiff Maislin Industries filed a cross-motion for summary judgment on May 11, 1988 contending that the ICC's above-noted decision constitutes an "advisory opinion, is not binding on the Court, is contrary to law and should not be adopted." [1]

#### B.

When the ICC resolves a question within its primary jurisdiction the Commission's final determination should be accorded substantial deference and should not be set aside unless it exceeds the ICC's statutory authority or is unsupported by substantial evidence. *See Consolo v. Federal Maritime Commission,* 383 U.S. 607, 619–21, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966) ("By giving the agency discretionary power to fashion remedies, Congress places a premium upon agency expertise, and for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency."); *Erickson Transport Corp. v. I.C.C.,* 728 F.2d 1057, 1062–63 (8th Cir.1984) ("the substantial evidence test is a narrow one and the reviewing court is not to substitute its conclusions for those of the Commission"); *Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430

---

**1.** In light of the ICC's January 12, 1988 decision and the pending cross-motions for summary judgment, we will enter an order lifting the stay in the above-styled case and direct the Clerk to place this case back on the active docket for the purpose of ruling the pending motions.

F.2d 334, 341 (1st Cir.1970). If the Commission departs from its former policy in resolving an issue within its primary jurisdiction, as in the instant case, it must adequately explain its change of policy in a manner sufficient to permit judicial review of the ICC's policies. *See, e.g., Seaboard System R.R., Inc. v. United States,* 794 F.2d 635, 639 (11th Cir.1986); *Intercity Transportation Co. v. United States,* 737 F.2d 103, 108 (D.C.Cir.1984). For the reasons we now state, we find that the ICC's January 12, 1988 decision should be affirmed and that summary judgment in favor of the defendant should be granted pursuant to Rule 56, Fed.R.Civ.P.

## II

The Interstate Commerce Commission's findings of fact in the above-styled case are supported by the substantial evidence in the record as a whole.[2] Accordingly, the Commission's findings of fact as set forth in its January 12, 1988 order are incorporated herein by this reference as our findings of fact.

## A.

■ Plaintiffs initially contend in their suggestions in support of their motion for summary judgment that "it is clear … from the ICC decision that it neither addresses nor answers a question within its primary jurisdiction." Plts' Brief at 4. We disagree.

In the ICC's January 12, 1988 decision the Commission accurately stated that this Court "referred to the commission the question of the reasonableness of the rates sought to be collected by Maislin, and whether allowing their collection would be an unreasonable practice." ICC's Order at 1. Plaintiffs do not contest that the ICC has primary jurisdiction over the former question, but rather disputes its primary jurisdiction over the latter.

This Court's September 3, 1985 order definitively ruled on and rejected plaintiffs' primary jurisdiction contention. In our order we expressly found that, *inter alia,* the question of whether "plaintiffs' practice of assessing and rebilling the [defendant] higher freight rates and charges than those originally quoted by [plaintiffs], agreed upon by the parties, confirmed in writing and billed by the [plaintiffs] constitutes an unreasonable, unlawful, unfair, and deceptive practice in violation of 49 U.S.C. §§ 10701(a) and 10761" is a question within the primary jurisdiction of the ICC. Order at 2.

In so concluding, we stated that the doctrine of primary jurisdiction has been applied where action otherwise within the jurisdiction of the Court "turns on a determination of the reasonableness of a challenged practice. *Nader* [*v. Allegheny Airlines, Inc.*] *supra,* 426 U.S. [290] at 304–05 [96 S.Ct. 1978 at 1987, 48 L.Ed.2d 643 (1976) ]." Order at 3. We thus found that the "doctrine requires the court to refer the matter to the ICC where 'the claim presented to the court requires an inquiry into the lawfulness of a carrier's practice.' *Iowa Beef Processors* [*v. Illinois Central Gulf Railroad Company* ], *supra,* 685 F.2d [255] at 621 [260 (8th Cir.1982) ]." Order at 3.

We further noted that the ICC was investigating similar complaints and that "[s]uch a policy decision should be dealt with uniformly and with reference to the underlying reasons and policies for the regulations." *Id.* at 4. Thus we concluded that "it is appropriate that we defer to the special expertise, competence, and administrative discretion possessed by the ICC." *Id.*

The Eighth Circuit has not addressed the application of the primary jurisdiction doctrine in a case, such as this, involving an allegation of unreasonable collection of undercharges. *See In re Total Transportation, Inc.,* 84 B.R. 590, 596 (D.Minn.1988)

---

**2.** The record before the ICC is attached to defendant's motion for summary judgment as appendices 8–12. Neither party, for the most part, contests the ICC's findings of fact. Plaintiffs, however, do contest the ICC's finding that a

negotiated rate existed as to all the shipments at issue. For the reasons we set forth in part II, C of this memorandum opinion, we find plaintiffs' contention is without merit.

(noting the Eighth Circuit has not been presented with the precise question at issue). The Eleventh Circuit, however, has addressed the precise question we ruled on in our September 3, 1985 Order which plaintiffs again raise in their suggestions in support. *Seaboard System R.R. Inc. v. United States*, 794 F.2d 635, 638 (11th Cir. 1986). The Eleventh Circuit, relying on *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), specifically found that "finding a carrier practice unreasonable is the kind of determination that lies in the primary jurisdiction of the commission." *Id.* Thus, the *Seaboard* court concluded that the Commission's action of determining whether the collection of undercharges was an unreasonable practice under the circumstances of that case was both "justified and within its jurisdiction." *Id.* 637–639.

Subsequent to our September 3, 1985 order, a plethora of lower federal courts have also addressed the precise question presented by plaintiffs' initial contention. The majority of those courts have concurred with our finding in our September 3, 1985 Order.[3] *See, e.g., RTC Transportation, Inc. v. Country Pride Foods, Ltd.*, No. CIV S86–1509–MLS/JFM, 1987 W.L. 46938 (E.D.Cal.1987); *Motor Carrier Audit and Collection Co. v. Orval Kent Food Co.*, No. 87 C 5860, 1987 W.L. 18349 (N.D. Ill.1987); *Delta Traffic Service Inc. v. Marine Lumber Co.*, 683 F.Supp. 754 (D.Colo. 1987); *In re Tucker Freight Lines Inc.*, 85 B.R. 426 (W.D.Mich.1988); *In re Amarex, Inc.*, 74 B.R. 378 (Bankr.W.D.Okla.1987); *Motor Carrier Audit & Collection Co. v. Family Dollar Stores*, 670 F.Supp. 644 (W.D.N.C.1987); *Inf, Ltd. v. Spectro Alloys Corp.*, 651 F.Supp. 1405, 1407–08 (D.Minn.1987). For additional cases see *In re Total*, 84 B.R. at 594 n. 2.

In light of our September 3, 1985 Order and the subsequent court decisions noted above supporting our ruling, we find and conclude plaintiffs' primary jurisdiction contention is untenable and must be rejected.

**B.**

▮ Plaintiffs' correlative contentions in their suggestions in support may be summarized as follows: The ICC's "practices" jurisdiction does not empower the ICC to consider equitable defenses or authorize payment of charges below those contained in a published tariff; for such a policy would violate the proscription of 49 U.S.C. § 10761(a) and the long-standing "filed rate" doctrine. Plaintiffs' contentions are essentially the same as those contained in their briefs filed before the ICC. *See* Deft's Brief, Exh. 9. We find and conclude that the ICC's action in the above-styled case is sufficiently explained, justified, and within the limits of the Commission's statutory authority under 49 U.S.C. §§ 10701(a), 10704(a)(1).

The Interstate Commerce Act, 49 U.S.C. § 10762(a)(1), requires all motor common carriers to publish and file tariffs containing their transportation rate with the ICC. The carrier is obligated to collect the rate published in its tariff (49 U.S.C. § 10761(a)) and failure to do so constitutes a criminal offense under 49 U.S.C. § 11903(a).

In the past, courts have not permitted deviation from the filed rate "upon any pretext." *See, e.g., Louisville & Nashville R.R. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed.2d 853 (1915) ("Ignorance of misquotation is not an excuse for either paying or charging less or more than the rate filed."). The Commission historically has also refused to order the waiver of

---

**3.** This Court is fully cognizant of and has reviewed the decisions cited by plaintiffs which are in opposition to our September 3, 1985 order. *See* cases cited in plaintiffs' brief at 13 and Exhibit 1; *see also* cases cited in *In re Total*, 84 B.R. at 595 n. 3.

We, however, take a different view. A view supported by both the Eleventh Circuit and the majority of lower federal courts.

We further note that the United States Bankruptcy Court for the Eastern District of Michigan also referred the reasonableness of the rates sought to be collected by Maislin from 32 shippers similarly situated to defendant Primary Steel. On June 30, 1988 the ICC ruled that it would be an unreasonable practice for such shippers to pay the filed rate rather than the rate negotiated by the parties. *See* ICC Decision No. MC–C–30013 (June 30, 1988).

undercharges based on ignorance or carrier misquotations. *See, e.g., Rebel Motor Freight, Inc. v. Southern Beverage Co., Inc.,* 673 F.Supp. 785, 788 (M.D.La.1987).

This rule of law is known as the "filed rate doctrine." Courts and the ICC have refused to digress from this harsh rule or to grant waiver of undercharges for fear that such a policy might lead to intentional "misquotations" by carriers seeking to discriminate in favor of particular shippers. *See, e.g., Motor Carrier Audit & Collection Co. v. Family Dollar Stores,* 670 F.Supp. 644, 645 (W.D.N.C.1987) (citations omitted).

■ In 1986, the ICC announced a change in its policy regarding the strict enforcement of tariff rates. In light of the substantial deregulation of the common carrier industry accomplished by the Motor Carrier Act of 1980, the Commission determined that the rule prohibiting equitable defenses was no longer strictly applicable in cases where a motor common carrier has negotiated a lower rate and has indicated that the negotiated rate would be the one charged. *See* National Industrial Transportation League—Petition for the Institution on Negotiated Motor Common Carrier Rates, ex parte No. MC–177 (Oct. 29, 1986) (hereinafter *Negotiated Rates* ). The ICC's new policy, as set forth in *Negotiated Rates,* is that upon a court's request, the Commission will determine, based on all the relevant circumstances, whether collection of undercharges would constitute an unreasonable practice under 49 U.S.C. § 10704(a) and if a negotiated rate is found to exist, whether the negotiated rate is all the carrier should be permitted to collect.

The ICC appropriately emphasized in its decision in the above-styled case that "an inflexible approach to this issue frustrates the intent of the national transportation policy to encourage pricing innovation, since it could chill rate negotiation between shippers and carriers and inhibit legitimate pricing initiatives. On the other hand, permitting equitable defenses in limited situations, we found, comports with the spirit of the Motor Carrier Act of 1980, Pub.L. 96–296, 94 Stat. 793 (1980)." ICC's Order at 5.

The ICC decision in this case, consistent with its policy statement in *Negotiated Rates,* identified the following two statutory provisions as its authority for considering all the circumstances underlying an undercharge suit and finding that the tariff filed by motor carriers need not and should not be applied: (1) 49 U.S.C.A. § 10701(a) which provides that "a practice ... subject to the jurisdiction of the [ICC] ... must be reasonable," and (2) *id* § 10704(a)(1) which authorizes the ICC to order a carrier to stop a violation.

This exercise of authority, as the ICC first emphasized in its policy statement and reiterated in its order, has been confirmed by the Eleventh Circuit in *Seaboard System R.R., Inc. v. United States,* 794 F.2d 635 (11th Cir.1986). The court in *Seaboard* affirmed the ICC's determination in *Buckeye Cellulose Corp. v. L & N R.R. System R.R. Co.,* 1 I.C.C.2d 767 (1985),[4] that Sections 10701(a) and 10704(a) permit the ICC to consider a shipper's equitable defenses in a rail carrier's undercharge collection suit. *Id.* at 638. The *Seaboard* court agreed with the ICC that "changed circumstances" warranted re-examination of its previous policy of refusing to consider equitable defenses. 794 F.2d at 638. That case emphasized "[t]he Interstate Commerce Act, as amended, still embodies the policies of nondiscrimination and uniformity. The primary authority to give effect to those policies, though, is reposed in the ICC. *Cf. Nader,* 426 U.S. at 304, 96 S.Ct. at 1987." *Id.*

Nothing prohibits the ICC from changing its policy on enforcing the "unreasonable practice" provision of section 10701(a). *Id.* at 638. *Seaboard* also found the Commission's new policy "did not abolish the requirement of 49 U.S.C.A. § 10761(a) that carriers must charge the tariff rate. The statute does not say what remedy is available if less than the tariff rate has in fact been charged and paid for past shipments. That has been worked out by the Commission and judicial decision." *Id.*

---

**4.** This Court cited *Buckeye* with approval in our   September 3, 1985 Order.

The Eleventh Circuit in *Seaboard* thus concluded that the Commission had adequately set forth its basis for its change of position and that its change was justified and consistent with the ICC's statutory mission. *Id.* at 638–39.

The majority of lower federal courts have agreed with the Eleventh Circuit's decision in *Seaboard. See, e.g., In re Tucker Freight Lines, Inc.,* 85 B.R. 426, 427–30 (W.D.Mich.1988); *Motor Carrier Audit,* 670 F.Supp. at 647–650; *Younger Transportation v. TMBR Drilling, Inc.,* No. MO–85–CA–20 (W.D.Tex.1987). For example, in *Younger Transportation v. TMBR Drilling, Inc.,* which involved facts similar to the case at hand, the Court held that the "ICC has jurisdiction and authority to consider the circumstances surrounding complainant's claim to the benefits of an allegedly negotiated rate." Slip. op. at 5. Thus the *Younger* court upheld the ICC's finding that "[i]t is not a reasonable practice for defendant Younger to collect the tariff base rate (rather than the negotiated rate) for the shipment described in this proceeding." *Id.*

We agree with the above-noted decisions and therefore find and conclude that the ICC's change in policy and consideration of equitable defenses in the instant case was justified and consistent with its "practices" jurisdiction under the Interstate Commerce Act.

We further find and conclude that plaintiffs' reliance on *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), and *Regular Common Carrier Conference v. United States,* 793 F.2d 376 (D.C.Cir.1986), is untenable. For as the ICC accurately stated in its January 12, 1988 order those cases did not involve "the question of equitable defenses to a claim for undercharges." ICC's Order at 5. Moreover, those decisions did not hold that the Commission is precluded from passing on the reason-

ableness of carrier practices pursuant to its express authority in Section 10701(a). *Id.* For "the portions of *Square D, supra,* reaffirming that carriers must file their rates do not mean that [the Commission] lacks the authority to find, in an appropriate case, that allowing a carrier to collect the tariff rate would be unreasonable." *Id.*

Finally, we emphasize the ICC is "not abolishing the requirement in section 10761 that carriers must continue to charge the tariff rate. Rather, the ICC is simply exercising its authority to consider all the circumstances surrounding complainant's claim to the benefits of the allegedly negotiated rate in a case by case basis." *Id.*[5]

In light of our findings that the ICC's exercise of authority in the instant case was within its primary jurisdiction and consistent with the Interstate Commerce Act, we now turn to the issue of whether the Commission's decision is supported by substantial evidence.

## C.

█ Defendant contends that the Commission's determination that the collection of the claimed undercharges by the plaintiffs "would result in an unreasonable practice pursuant to 49 U.S.C. § 10701(a) was supported by substantial evidence." Brief at 22. We agree.

After an extensive review of all the facts and circumstances in this case in light of its experience and expertise, the ICC found the following: (1) plaintiffs over a continuing period of time offered defendant transportation at various quoted rates which defendant accepted; (2) defendant reasonably relied on plaintiffs to implement properly the quoted rate; (3) plaintiffs' failure to do so, despite defendant's lack of diligence, should under the circumstances, preclude plaintiffs later collection of undercharges; (4) there is absolutely no evidence that defendant agreed to pay any more

---

**5.** For the same reasons noted above, we find plaintiffs' reliance on the Eighth Circuit's decision in *Paulson v. Greyhound Lines, Inc.,* 804 F.2d 506 (1986), is untenable. Although the Eighth Circuit has acknowledged the ICC's change in policy in *Inman Freight Systems, Inc.* *v. Olin Corp.,* 807 F.2d 117 (8th Cir.1986), it has not addressed whether this exercise of authority is consistent with the Interstate Commerce Act. In *Inman* the Court simply stated that "ICC's new policy does not apply directly to this case." *Id.* at 119.

than the amount plaintiffs originally quoted and billed for each shipment; (5) there is absolutely no evidence that plaintiffs even demanded additional amounts over the amounts they billed at any time during the business relationship with defendant; and (6) defendant reasonably believed that the amounts quoted and billed by plaintiffs were the correct total charges for the transportation services it performed, that the amounts were reached as the result of negotiations between the parties and thus, since full payment was made by defendant, plaintiffs are equitably entitled to collect no more. ICC's Order at 9–10.

Our view of the record before the ICC establishes the above findings are supported by substantial evidence. We therefore reject plaintiffs' contention that the "commission's conclusion as to the existence of a negotiated rate on all shipments is not supported by substantial evidence."

To support this position, plaintiffs argue, as they did before the ICC, that numerous discrepancies exist between the negotiated or quoted rates and those actually charged by plaintiffs. We, however, agree with the ICC's finding that such discrepancies are insignificant.[6] In light of the evidence accurately set forth in the ICC's decision, plaintiffs' contention must be rejected. *See* ICC's Order at 7–8.

In sum, we find and conclude that the Commission's determination that a negotiated rate existed and that the collection of the alleged undercharges would be an unreasonable and unlawful practice is supported by substantial evidence and thus should be affirmed. We therefore grant summary judgment in favor of defendant.

Accordingly, it is

ORDERED (1) that the stay in the above-styled case should be and the same is hereby lifted and the Clerk is directed to place the case back on the active docket. It is further

ORDERED (2) that plaintiffs' motion for summary judgment should be and the same is hereby denied. It is further

ORDERED (3) that defendant's motion for summary judgment should be and the same is hereby granted. It is further

ORDERED (4) that the Clerk is directed to enter judgment in favor of the defendant and against the plaintiff on a separate document in accordance with Rule 58 of the Federal Rules of Civil Procedure.

---

6. The ICC accurately stated that "of the 400 shipments identified by Maislin, 177 show a plus or minus 1–cent difference between the rate billed and rate on the rate sheets, and another 77 show a plus or minus 2–cent difference, for a total of 254. Of the remaining 146 shipments, 76 show a difference of plus or minus 5 cents or less. The remaining shipments vary by as much as 30 cents above or below the rate sheet figures." ICC's Order at 7.