**James B. ORR and Highway Express, Inc., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Sewell Plastics, Inc., Intervenor for Respondent.**

**No. 86–2874–GA.**

United States District Court, W.D. Tennessee, W.D.

Nov. 17, 1988.

See also, 707 F.Supp. 967.

James N. Clay, Memphis, Tenn., for plaintiff.

Michael P. Coury, Memphis, Tenn., for defendants.

Dennis Starks, Office of Gen. Commerce Commission Counsel, I.C.C., Washington, D.C. for I.C.C.

## ORDER AFFIRMING DECISION OF ICC AND GRANTING PARTIAL SUMMARY JUDGMENT

GIBBONS, District Judge.

Petitioners in this case, James B. Orr (Orr) and Highway Express, Inc. (Highway), request a review of the decision of the Interstate Commerce Commission (ICC) that found their attempt to collect "undercharges" from Sewell Plastics, Inc. (Sewell) to be an "unreasonable practice." The petitioners have asked this court to reconsider the decision based on the assertion that the ICC cannot administratively change the long-standing "filed rate doctrine." After considering the briefs of all parties in this case and the record before the ICC in reaching its decision, the court affirms the decision of the ICC, and dismisses the petitioners' claim for the undercharges that occurred in interstate commerce. The alle-

gations relating to intrastate commerce remain.

This dispute is over a practice in the trucking industry whereby some companies, in an attempt to bolster business, will negotiate a lower rate than is contained in a tariff for shipping in interstate commerce.[1] Until 1986, this practice was universally prohibited by the ICC and the courts. As a result, shippers who had thought they had negotiated a bargain, would be forced to pay the difference between the negotiated rate and the typically higher "class" rate, or the rate on the tariff, that the carrier would have on file for the route in question. This was known as paying an "undercharge." But in National Industrial Transportation League–Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates; Ex Parte No. MC–177 (hereinafter *Negotiated Rates*), 1986 Fed.Carr.Cas. (CCH) ¶ 37,284, the ICC decided that in some cases, it would be an unreasonable practice to allow carriers to negotiate a low rate to induce business, and then request "undercharges" after completing the job. The ICC noted the possibility for abuse in such a situation, which would be counterproductive to Congress' stated objective of increasing competition when the trucking industry was deregulated in 1980. *Negotiated Rates* at ¶ 37,284.03. As a result, in such situations, the ICC decided to allow shippers to raise "equitable defenses" to an undercharge allegation. *Id.* Thus, in certain situations, the ICC has found that it would be an unreasonable practice to allow a carrier to receive undercharges where the shipper could show equitable reasons (namely a negotiated lower rate and reliance upon the carrier to publish it) why it should not be allowed. See, *e.g., Maislin Industries v. Primary Steel, Inc.,* 705 F.Supp. 1401,

(W.D.Mo.1988). In this case, respondent, Sewell, moved to have the question of unreasonableness of Highway insisting on an undercharge in light of a negotiated lower rate, referred to the ICC. That motion was granted on March 18, 1987. The ICC found it would be an unreasonable practice to allow collection of the undercharge by decision January 25, 1988. Subsequently, Orr, who is the assignee of Highway's rights in collecting the amount in controversy here, and Highway, petitioned this court for a review of that determination.

This court's review of the ICC's decision is governed by 5 U.S.C. § 706 which sets forth the standard of review by a district court of an administrative agency's decision. The statute states:

> The reviewing court shall— ...
>
> (2) hold unlawful and set aside agency action, findings and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; ...
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; ...
>
> (D) unsupported by substantial evidence ...
>
> (F) unwarranted by the facts.... In making the foregoing determination, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

In determining whether ICC's action is arbitrary and capricious, this court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of

---

1. Under 49 U.S.C. § 10761(a), "a carrier providing transportation ... subject to the jurisdiction of the Interstate Commerce Commission ... shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect.... That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facili-

ty that affects the value of that transportation or service or another device." Carriers are essentially required to "file with the Commission actual and minimum rates for the transportation it may provide...." 49 U.S.C. § 10702(b). This requirement of publishing rates are subject to "relief," granted by the Commission "when relief is consistent with the public interest and the transportation policy of section 10101." 49 U.S. C. § 10761(b).

judgment. [citations omitted] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938). It is fundamental, therefore, that this review is limited.

The facts are essentially undisputed. The following is based on the record before the ICC: Sewell is the manufacturer and distributor of plastic products. In 1983, "the trucking business in Mississippi became very competitive." Statement of Del Slone, Sewell's Sales Service Manager p. 1. Highway solicited Sewell's shipping business and negotiated a rate for shipping plastic containers from Sewell's plant in Jackson, Mississippi to various destinations in Louisiana and Mississippi. Because the volume of business by Sewell with Highway was great, Highway negotiated a "flat charge" for the shipping which was less than the "published" rate contained in the tariff. Deposition of Harvey E. West, Jr., Vice President of Highway p. 8. From September 6, 1983, to December 30, 1983, Highway billed Sewell at a rate of $285 per shipment; but from January 3, 1984, to February 1, 1984, the rate charged varied between the published "class" rate of $300 and the lower negotiated rate of $285. The negotiated rate of $285 was not published. Statement of Walton D. Bendell, Sewell Corporate Transportation Manager p. 2; Statement of Howard Covington, former Highway Terminal Manager pp. 1–2. The parties now dispute the payment by Sewell of the lower, unpublished rate. Highway asserts it is owed $103,063.19, which represents the difference between the published rate and the unpublished rate for the containers shipped in interstate commerce.

For more than seventy years, it has been the opinion of the United States Supreme Court that "the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext." *Louisville & Nashville Railroad Company v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). This has become known as the "fixed rate doctrine." On October 14, 1986, the ICC modified this stance by announcing that in undercharge cases involving motor carriers, it would "consider all the circumstances surrounding an undercharge suit," before determining if forcing a shipper to pay an undercharge would be an "unreasonable practice." *Negotiated Rates* ¶ 37,284.03 at 47,-350. One of the chief reasons for this shift in policy was the change that had occurred in the regulatory environment in 1980 with the passage of the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (codified at 49 U.S.C. §§ 10101 to 11902a), which allowed carriers "to negotiate particularized rate arrangements with shippers." *Negotiated Rates* ¶ 37,284.03 at 47,350. The ICC decided that "our former policy of penalizing shippers for carriers' mistakes regardless of the circumstances is unnecessary and inappropriate to deter discrimination under today's statutory scheme." *Id.* at 47,351. As a result, the ICC said it would consider "equitable defenses to rigid application of filed tariff rates ... available on a case-by-case basis," and that the ICC's "unreasonable practice jurisdiction" authorizes this approach. *Id.*

It is uncontested that there was a negotiated rate in this case that was lower than the published rate. The ICC rejected Highway's assertion that Sewell should have undertaken to check to see that Highway had published the negotiated rate. *Sewell Plastics, Inc. v. Highway Express, Inc.*, No. MC–C–30027, at 3 (I.C.C. Jan. 25, 1988). The Commission found that there was an implied contract between the parties to ship at the $285 rate. *Id.* at 3–4. Further, the ICC said that the "record establishes that Sewell relied on the quoted rates when it tendered its freight to Highway." *Id.* at 4. Thus, by allowing Sewell to rely on the negotiated rate, the ICC concluded that "collection of the published tariff rate in

these circumstances would be an unreasonable practice." *Id.* Based on the narrow review this court is to give this finding, it cannot say that the ICC's conclusions in this case are arbitrary and capricious, nor in excess of the Commission's jurisdiction, nor unsupported by substantial evidence or the facts. See 5 U.S.C. § 706. In fact, this decision is in keeping with the ICC's announced view of such practices that was stated in *Negotiated Rates,* and is consistent with the facts found through the depositions and statements submitted to the ICC. As a result, this court adopts the facts as found by the Commission in this case, and affirms the finding by the ICC that collection of the undercharge for the interstate transportation would be an "unreasonable practice."

Petitioners have urged several grounds as error in this decision. Their chief contention, in summary, is that the ICC's opinion was "clearly contrary to law," and beyond its jurisdiction.[2] Initial Brief of Petitioners at pp. 6–19. Several other courts have confronted this charge and upheld the ICC's authority to determine that despite the fixed rate doctrine, some arrangements between a carrier and shipper are valid and it is an unreasonable practice to allow the collection of an undercharge. *See, e.g., Maislin Industries v. Primary Steel, Inc.,* 705 F.Supp. 1401, (W.D.Mo.1988); *Younger Transportation, Inc. v. T.M.B.R. Drilling, Inc.,* No. MO–85–CA–20 (W.D.Tex. Sept. 23, 1987).

It is undisputed that the question of whether certain acts constitute "unreasonable practices," is within the ICC's primary jurisdiction. 49 U.S.C. § 10701; *Seaboard System Railroad, Inc. v. United States,* 794 F.2d 635, 637 (11th Cir.1986); Order of Partial Reference to the ICC, *Orr v. Sewell Plastics,* No. 86–2874, —— F.Supp. ——,

(W.D.Tenn. Mar. 18, 1987) at 4. ("The ICC has more expertise in determining whether plaintiff's practices are reasonable and thus this court must defer to the Commission.") Therefore, the issue of whether the ICC has the jurisdiction to determine whether the collection of undercharges here is unreasonable or not cannot be seriously questioned.

The chief question before this court, then is whether the ICC's decision was contrary to law. It is true that *Maxwell* and its progeny require collection of the "published" tariff rate over any other misquoted or unpublished rates. *See Maxwell,* 237 U.S. at 97, 35 S.Ct. at 495. However, *Maxwell* and the cases that followed never said that the ICC could not modify this position by allowing a case-by-case approach to be taken to see if the fixed rate doctrine could result in an unreasonable practice. *Maxwell* "dealt with the *courts'* authority to grant equitable defenses to undercharge actions." *Seaboard System,* 794 F.2d at 639 (emphasis in opinion). The approach by the ICC is not an abrogation of the fixed rate doctrine. Indeed, where it prevents unjust or discriminatory practices, it is still as valid as ever. But where the doctrine is applied in a wooden, rigid manner that is contrary to congressional policy with respect to the interstate trucking industry, the ICC has decided that it will consider all the circumstances before determining whether an undercharge assessment is consistent with the spirit of the statute. Nor does this policy undercut the mandate of 49 U.S.C. § 10761(a) that a "carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff...." This blanket prohibition is tempered by the ICC's jurisdiction to declare some practices to be "unreasonable" under 49 U.S.C. § 10701(a).

**2.** In addition to this point, the petitioners allege that the ICC has acted "arbitrarily, capriciously" and abusively. Initial Brief of Petitioners at 19–30. This charge has four sub-elements: that the ICC's decision in this case violates several statutory dictates, that the ICC cannot declare the law of contracts, that the ICC has acted arbitrarily as to the procedure followed by the Commission in reaching its decision, and that it

went beyond its authority in deciding Highway's attempted collection of an undercharge would be "unreasonable." The court carefully reviewed these allegations, and finds that they are similar in substance to the allegations that the ICC's decision was contrary to law and beyond the Commission's jurisdiction. These issues are not addressed further because they are without merit.

*See Seaboard System*, 794 F.2d at 637. As stated by the Eleventh Circuit:

> The Interstate Commerce Act, as amended, still embodies the policies of nondiscrimination and uniformity. The primary authority to those policies, though, is reposed in the ICC. *Cf. Nader [v. Allegheny Airlines, Inc.]*, 426 U.S. [290,] ... 304, 96 S.Ct. [1978,] ... 1987 [48 L.Ed.2d 643 (1976) ]. Nothing prohibits the ICC from changing its policy in enforcing the "unreasonable practice" provision of section 10701(a).

*Seaboard System*, 794 F.2d at 638. Thus, it is clear that the fixed rate doctrine is still the law, but that the ICC will scrutinize situations in which a carrier alleges an undercharge is due, when in fact such an undercharge was the basis of the bargain between the shipper and the carrier, and injustice would occur if the carrier recovered an undercharge.[3] The only Sixth Circuit case cited by the petitioners is *Norfolk & Western R. Co. v. American Compressed Steel Corp.*, 181 F.2d 183 (6th Cir. 1950). However, this case, along with many cited in the petitioners' brief, dealt with the prohibition of courts considering equitable defenses to undercharges. Further, *Norfolk & Western* was decided before the policy shift by Congress in 1980 to allow a more competitive environment to develop in the trucking industry. Before this court is a decision by the ICC that merely weighs all the circumstances of this particular case and decides that it would be an unreasonable practice to have the respondents pay the undercharge. It is clearly within the primary jurisdiction of the ICC to determine if a practice is "unreasonable" or not. 49 U.S.C. § 10701; *Seaboard Systems*, 794 F.2d at 637; *Maislin Industries*, unpublished op. at 11. Therefore, it is not contrary to law for the ICC to determine that in this particular case, a certain practice is "unreasonable," even if that practice relates to the fixed rate doctrine. As the ICC noted in *Negotiated Rates*, "an inflexible policy frustrates the intent of the national transportation policy to encourage pricing innovation, since it could chill rate negotiation between shippers and carriers, and inhibit legitimate pricing initiatives. On the other hand, permitting equitable defenses in limited situations comports with the spirit of the Motor Carrier Act...." *Negotiated Rates* at 47,351.

Respondents United States of America and Interstate Commerce Commission, have moved for summary judgment "insofar as necessary to give effect to the ICC's finding," that collecting an undercharge here would be an unreasonable practice. Respondents' Response to Petitioners' Initial Brief: Motion for Summary Judgment at 2. Because this court affirms the decision of the ICC, and recognizes that this decision is within the ICC's primary jurisdiction, the court grants summary judgment in favor of Sewell and the respondents with respect to the interstate commerce charges.

The decision by the ICC, adopted by this court, moots the petitioners' claim for the undercharge and attorneys fees in this matter. Therefore, summary judgment is granted as to the interstate commerce allegations. The issues arising out of petitioner's claim for undercharges in intrastate commerce remain for trial.

IT IS SO ORDERED.

---

**3.** In its decision in this case, the ICC pointed out that in *Negotiated Rates*, "we did not eradicate the doctrine that the rate is filed as a matter of public record and that the shipper is charged with constructive notice of the actually filed rate. In situations such as these, we are balancing the equities to determine whether, under the circumstances, adherence to the filed rate doctrine would lead to an unreasonable result." *Sewell Plastics, Inc. v. Highway Express, Inc.*, No. MC–C–30027, at 4 n. 1 (I.C.C. Jan. 25, 1988).